**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Patrick R. FREGA, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**James Alan Malkus, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**G. Dennis Adams, Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellant,**

v.

**Patrick R. Frega; James Alan Malkus;**
**G. Dennis Adams, Defendants–**
**Appellees.**

Nos. 97–50100, 97–50111, 97–50113 and 97–50171.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1998.

Filed June 8, 1999.

796

Henry H. Rossbacher (argued), Rossbacher & Associates, Los Angeles, California; John Y. Tremblatt, San Diego, California; Nicholas DePento, San Diego, California, for defendant-appellant-cross-appellee Patrick R. Frega.

Ezekiel E. Cortez, Aaron & Cortez, San Diego, California, for defendant-appellant-cross-appellee James Alan Malkus.

Mario G. Conte, Federal Defenders of San Diego, San Diego, California, for defendant-appellant-cross-appellee G. Dennis Adams.

Demetra Lambros (argued), United States Department of Justice, Washington, D.C.; Charles G. La Bella, Acting United States Attorney, San Diego, California; Stephen P. Clark, Phillip L.B. Halpern, Kevin J. Kelly, Thomas W. McNamara, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee-cross-appellant.

Daniel J. Popeo, Paul D. Kamenar, David M. Young, Washington, DC, for amicus curiae Washington Legal Foundation, in support of plaintiff-appellee.

Before: BRIGHT,** REINHARDT, and RYMER, Circuit Judges.

Sections I, VI and VII were authored by Judge REINHARDT; sections II, III, IV, V and VIII by Judge RYMER; Partial Concurrence and Partial Dissent by Judge RYMER.

Attorney Patrick Frega and former California Superior Court judges James Malkus and Dennis Adams appeal their convictions following a jury trial for conspiring to conduct the affairs of the San Diego Superior Court through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), and for mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. Frega also appeals his conviction for conducting the affairs of the Superior Court through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c). The government cross-appeals the sentences imposed. We affirm the mail fraud convictions as to all three defendants as well as Frega's substantive RICO conviction, reverse the RICO conspiracy convictions, and deny the cross-appeal. We remand for reconsideration of the defendants' sentences in light of our decision.

I

This case involves allegations of numerous bribes paid by Patrick Frega, a San Diego attorney, to three then Superior Court judges, Dennis Adams, James Malkus, and Michael Greer. Over a period of twelve years, Frega, together with Jim Williams, the owner of a San Diego car dealership, purportedly gave more than $100,000 in payments and benefits—ranging from automobiles, car repairs, money orders, an apartment, health club memberships, and a queen-sized bed—to the judges or members of their families. In exchange, Frega allegedly sought and received an unfair advantage in the cases in which he was involved in the Superior Court.

In June of 1996, after Greer became a witness for the prosecution, a grand jury returned a twenty-one count indictment against Frega, Malkus and Adams.[1] The Indictment charged all three with RICO conspiracy in violation of 18 U.S.C. § 1962(d) ("Count One"). This charge was based on allegations that the three defendants had conspired to conduct the affairs

---

** Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. This Indictment was the Second Superseding Indictment, replacing the original Indictment, filed by the Government on April 9, 1996 and the Superseding Indictment, filed on June 4, 1996. The two previous Indictments had charged the three defendants with one count of bribery in violation of 18 U.S.C. § 666 and several counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1346. The Second Superseding Indictment was filed after defendants' motion to dismiss the 18 U.S.C. § 666 bribery offense was granted.

of the Superior Court through a pattern of racketeering activity consisting of multiple acts of bribery in violation of Sections 92 and 93 of the California Penal Code and extortion in violation of 18 U.S.C. § 1951. Frega, Adams and Malkus were also charged with eighteen counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. The mail fraud counts specifically related to mailings done in furtherance of the defendants' alleged scheme to defraud the people of the State of California by depriving them of their right to the honest services of judges of the Superior Court. Most of the mailings listed in the Indictment related to an investigation of the defendants' actions conducted by the California Commission on Judicial Performance and involved documents sent to the Commission by Frega and the judges.[2] A few related to proceedings in the Superior Court. Additionally, the grand jury charged Frega with a substantive RICO offense in violation of 18 U.S.C. § 1962(c), and with forfeiture allegations pursuant to 18 U.S.C. § 1963. The substantive RICO charge alleged that Frega not only conspired to conduct the affairs of the Superior Court through his bribes, as charged in Count One, but that he in fact succeeded in doing so.

During a thirty-day jury trial, Malkus was the only defendant to take the stand. He professed complete ignorance of Frega's various expenditures on behalf of himself and his family. Adams, through counsel, acknowledged receiving Frega's many payments and benefits, but contended that he did so without corrupt intent. It was Frega's defense that his gifts to the judges were just that, gifts not bribes, conferred out of friendship and generosity.

The jury found Frega, Malkus, and Adams guilty of the RICO conspiracy charge. Frega was convicted on thirteen mail fraud counts, Adams of five. such

counts, and Malkus of six. The jury also found Frega guilty of committing the substantive RICO offense. The district court sentenced Frega and Adams to forty-one months imprisonment, and Malkus to thirty-three months.

Each appeals his conviction, raising myriad claims of error. The government cross-appeals the district court's application of the bribery guidelines and its refusal to adjust Frega's offense level upward for being a leader or organizer under U.S.S.G. § 3B1.1(a). We first analyze the defendants' claims and then the government's cross-appeal.

II

Frega claims that he was denied due process in the resolution of his claim of prosecutorial conflict of interest. Prior to indictment, Frega filed a motion to recuse the U.S. Attorney's Office on the ground that one of the attorneys in the office, Assistant U.S. Attorney Michael Dowd, had represented Frega before the Judicial Commission with respect to this case and had joined the law firm that represented Greer before the Commission. The district court found that an evidentiary hearing was unnecessary as Frega provided no evidence to believe that any disclosure by Dowd had occurred, or that the fire-wall built around the investigation before Dowd joined the office, or the office-wide screen that had been established specifically for Dowd after it was learned that Dowd was conflicted, was in any way breached. District judges have "substantial latitude" in deciding whether counsel must be disqualified, and we see no abuse of discretion. *United States v. Stites,* 56 F.3d 1020, 1024 (9th Cir.1995).

Declarations from those in charge of the investigation representing that they had

---

2. Judges Greer and Malkus resigned during the Commission's investigation, thus terminating its inquiry into the charges against them. Adams, however, contested the charges, unsuccessfully. He was removed from his position on the Superior Court by the California Supreme Court in 1995. *See Adams v. Comm'n on Judicial Performance,* 10 Cal.4th 866, 42 Cal.Rptr.2d 606, 897 P.2d 544 (1995).

received no information from Dowd, and that they had directed others working on it not to speak to Dowd, were uncontradicted. That the government did not submit a declaration from Dowd himself does not change the analysis. The U.S. Attorney's Office believed it would breach the firewall for any of its attorneys to obtain a declaration from Dowd, but the government did recommend that the court ask for one should any questions remain. In any event, Frega knew what Dowd knew and could have specified which broken confidences, if any, were suggested by the government's submissions. On the record adduced, there is no reasonable possibility of prejudice to the verdict, and thus no due process violation. *See United States v. Velasquez–Carbona,* 991 F.2d 574, 576 (9th Cir.1993).

### III

■ Malkus suggests that his prosecution exceeds the bounds of federal authority under *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which he reads to indicate that it is up to the states to decide whether criminal sanctions are necessary in areas of traditional state concern such as the state judiciary.[3] He also relies upon *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which he reads as holding that Congress must clearly state that it seeks to regulate the conduct of state officials. The short answer is that RICO explicitly makes it unlawful to agree to conduct an enterprise through predicate acts of *state* criminal violations, such as bribery. 18 U.S.C. § 1961(1)(A). As we recently noted:

> That RICO embodies a fundamental federal policy can scarcely be disputed.... RICO represents a fundamental choice by Congress to employ the heavy artillery of federal law against a variety of organized criminal endeavors involving security fraud, wire fraud, and bribery.

*Govett Am. Endeavor Fund Ltd. v. Trueger,* 112 F.3d 1017, 1021–22 (9th Cir.1997). Moreover, we have often affirmed RICO convictions involving bribery of state officials, *see, e.g., Jackson,* 72 F.3d at 1373 (bribery of state senator); *United States v. Dischner,* 974 F.2d 1502, 1506–08 (9th Cir. 1992) (bribery of a mayor), as have other circuits, *see, e.g., United States v. Griffith,* 85 F.3d 284, 288 (7th Cir.), *cert. denied,* 519 U.S. 909, 117 S.Ct. 272, 136 L.Ed.2d 195 (1996) ("[b]ribery of local ... officials is just the sort of corruption connoted by the term 'racketeering'"), and the United States Supreme Court, *see Salinas v. United States,* 522 U.S. 52, –– ––––, 118 S.Ct. 469, 472–73, 139 L.Ed.2d 352 (1997) (upholding RICO conspiracy convictions of deputy who accepted bribes from prisoners in county jail).

■ Beyond this, Malkus contends that RICO is facially unconstitutional under *Lopez. Lopez* struck down the Gun–Free School Zones Act on the ground that the statute did not implicate commercial activity that substantially affects interstate commerce. *See Lopez,* 514 U.S. at 551, 561, 115 S.Ct. 1624. However, unlike the Gun–Free School Zones Act, RICO by definition prohibits participating in an enterprise "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c). Because RICO is aimed at activities which, in the aggregate, substantially affect interstate commerce, "all that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce." *United States v. Juvenile Male,* 118 F.3d 1344, 1348 (9th Cir. 1997). In other words, *Lopez*'s "substantial effects" test is inapplicable. Unlike guns near schools that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624, courts in general, and the enterprise whose affairs Malkus conspired to

---

**3.** Although we recognize that the defendants all join in each other's arguments, for ease of reference we simply refer to the person primarily advancing the particular argument.

conduct through bribery in particular, are concerned daily with economic activity that has at least a de minimis effect on interstate commerce. Malkus does not cite any authority to support applying *Lopez* to RICO. In fact, we have rejected similar *Lopez* challenges. *See, e.g., Juvenile Male,* 118 F.3d at 1348–49. Since Congress is plainly empowered to regulate activity that has an impact on interstate commerce, RICO is not unconstitutional on its face,[4] nor as applied to Malkus.

## IV

■ Malkus next points out that he, Frega, and Adams successfully challenged a federal bribery charge pursuant to 18 U.S.C. § 666 in the original indictment on the ground that the conduct in question did not threaten federal funds. *See United States v. Frega,* 933 F.Supp. 1536, 1543 (S.D.Cal.1996).[5] After that count was dismissed, a second superseding indictment was filed charging them with a RICO conspiracy. Malkus argues that this amounted to retaliatory action by the government for the exercise of procedural rights that resulted in dismissal of the § 666 charge.

While we have yet to settle on a standard of review for vindictive prosecution, *see United States v. Montoya,* 45 F.3d 1286, 1291 (9th Cir.1995), we do not need to here, as Malkus's claim of prosecutorial vindictiveness fails whether our review is for abuse of discretion, clear error, or de novo. When, as here, there is no evidence of actual vindictiveness, "cases involving increased charges or punishments after trial are to be sharply distinguished from cases in which the prosecution increases charges in the course of pretrial proceedings." *United States v. Gallegos–Curiel,* 681 F.2d 1164, 1167 (9th Cir.1982); *see also United States v. Brooklier,* 685 F.2d

1208, 1215–16 (9th Cir.1982). At the pretrial stage, a prosecutor's assessment of the boundaries of his case may not yet have crystallized. *See United States v. Goodwin,* 457 U.S. 368, 381, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). In addition, defendants may be

> expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor. Defense counsel routinely file pretrial motions . . . to challenge the sufficiency and form of an indictment; . . . [i]t is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.
>
> Thus, the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.

*Id.* at 381–82, 102 S.Ct. 2485. Accordingly, a presumption of vindictiveness is not warranted here,

> simply because the prosecutor's actions followed the exercise of a right, or because they would not have been taken but for exercise of a defense right. Rather, the appearance of vindictiveness results only where, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights.

---

4. To the extent that Malkus challenges RICO as unconstitutionally vague, that challenge fails as well because we have already upheld the constitutionality of RICO against vagueness attacks. *See, e.g., United States v. Blinder,* 10 F.3d 1468, 1475 (9th Cir.1993).

5. The United States Supreme Court has since determined that federal funds do not have to be affected to support an indictment under § 666(a)(1)(B). *See Salinas,* 522 U.S. at ———–———, 118 S.Ct. at 473–75 (1997).

*Gallegos–Curiel,* 681 F.2d at 1168–69 (citations omitted). Since Malkus has shown no likelihood that the second superseding indictment would not have been returned absent hostility or a punitive animus towards him because he moved to dismiss the federal bribery charges, the decision to charge the RICO conspiracy was not vindictive.

## V

Adams, Malkus and Frega challenge their mail fraud convictions on various grounds.

## A

 Malkus and Adams claim that the mail fraud statute, 18 U.S.C. § 1346, does not reach schemes to deprive the people of a state of the intangible right to honest services, and that in any event § 1346 is unconstitutionally vague.[6] In short, their argument is that Congress did not intend § 1346 to overrule *McNally,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292. We think it did.

6. We review de novo a district court's construction or interpretation of a statute. *See United States v. Doe,* 136 F.3d 631, 634 (9th Cir.1998). The constitutionality of a statute is a question of law reviewed de novo. *See United States v. Hicks,* 103 F.3d 837, 847 (9th Cir.1996), *cert. denied,* 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997).

7. In introducing § 1346 as part of the Anti–Corruption Act of 1988, Senator Biden stated:

Mr. President, I am pleased today to join with my colleagues in introducing the Anti–Corruption Act of 1988.... This bill will make it possible, once again, to prosecute and send to prison those public officials who corrupt their offices and betray the trust placed in them. It *reverses* the *McNally* case by creating a new public corruption statute that will be used to bring charges against anyone who attempts to deprive the citizens of the United States or of any State of the honest services of a public official, or against anyone who attempts to corrupt the election process. It also amends the existing mail and wire fraud statutes to make clear that notwithstanding the holding in *McNally,* it is a crime to deprive any organization—such as a corporation or a labor

18 U.S.C. § 1341 prohibits "any scheme or artifice to defraud" through the use of the mail. In 1987, the Supreme Court held that the mail fraud statute "protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* at 356, 107 S.Ct. 2875. The Court added, "If Congress desires to go further, it must speak more clearly than it has." *Id.* at 360, 107 S.Ct. 2875.

On November 18, 1988, Congress responded by enacting 18 U.S.C. § 1346, which provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." The legislative history accompanying § 1346 specifically refers to the intention of Congress to overturn *McNally.*[7] We have previously acknowledged that § 1346 overruled *McNally.* *See, e.g., United States v. Lewis,* 67 F.3d 225, 233 & n. 13 (9th Cir.1995). So have other circuits.[8] We therefore make explicit what we have implicitly held before:

union—of the loyal services of its employees. This will restore the power of prosecutors to attack white-collar crime involving bribes and kickbacks.
134 Cong. Rec. S12581–04 (daily ed. Sept. 16, 1988) (statement of Sen. Biden) (emphasis added).

8. *See, e.g., United States v. Trapilo,* 130 F.3d 547, 551 n. 6 (2d Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *United States v. Frost,* 125 F.3d 346, 364 (6th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998); *United States v. Bailey,* 123 F.3d 1381, 1390 n. 12 (11th Cir.1997); *United States v. Brumley,* 116 F.3d 728, 732 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 625, 139 L.Ed.2d 606 (1997); *United States v. Blumeyer,* 114 F.3d 758, 765 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 350, 139 L.Ed.2d 272 (1997); *United States v. Czubinski,* 106 F.3d 1069, 1076 (1st Cir.1997); *United States v. Catalfo,* 64 F.3d 1070, 1077 n. 5 (7th Cir.1995); *United States v. Bryan,* 58 F.3d 933, 940 n. 1 (4th Cir.1995), *rev'd on other grounds, United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *United States v. Martinez,* 905 F.2d 709, 715 (3d Cir.1990).

Congress fully intended § 1346 to reach schemes that seek to deprive the people of a state of the intangible right to honest services.

■ Adams and Malkus submit that § 1346 is unconstitutionally vague. First, they contend that the word "another" is singular and cannot refer to the citizens of a state. However, "another" could also be read as referring to another state citizen, as the district court suggested in its published opinion, *see Frega*, 933 F.Supp. at 1546, or it could merely be inelegant. Either way, it is clear that Congress reacted, at the Court's invitation, to overrule *McNally*. We are not persuaded otherwise by Adams's attempt to find significance in the failure of the House to pass alternative versions of the statute that specifically mentioned public corruption. As the district court noted, that could simply mean that the House thought the Senate bill, which was somewhat broader in other respects, was better.

■ Malkus and Adams next argue that the terms "intangible rights" and "honest services" are unconstitutionally vague. A statute will be struck down on void for vagueness grounds if "it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1345 (9th Cir.1984). We agree with the district court that "[i]t is not unreasonable to conclude that a person of reasonable intelligence would conclude that the accepting of bribes while sitting as a judge constituted a criminal offense." *Frega*, 933 F.Supp. at 1547. As we have done before with the mail fraud statute, we reject the vagueness challenge here. *See United States v. Bohonus*, 628 F.2d 1167, 1174–75 (9th Cir.1980).

**B**

■ Frega contends that the mail fraud convictions contain a fatal variance and are tainted by instructional error. The claimed variance is that the indictment charges a single scheme but multiple independent goals and relationships were actually shown. The proof in the pudding, he submits, is that the jury failed to convict all three on any single mail fraud count.[9]

■ In order to convict for mail fraud, the jury had to find a scheme to defraud Californians of their right to the judges' honest services, and a use of the mails in furtherance of that scheme. The evidence need not exclude every hypothesis but that of a single scheme. *See United States v. Mastelotto*, 717 F.2d 1238, 1246 (9th Cir. 1983), *overruled on other grounds by United States v. Miller*, 471 U.S. 130, 135–36, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). We conclude that a rational trier of fact could find a single scheme to defraud because the two schemes are essentially the same, as are the factors to be considered. *See United States v. Morse*, 785 F.2d 771, 775 (9th Cir.1986) (noting the "expansive standard for a single scheme"). Each mail fraud count alleged a separate mailing by Frega or one of the judges. While the jury could have found all three responsible for each mailing because all participants in a mail fraud scheme have joint liability, *see United States v. Dadanian*, 818 F.2d 1443, 1446 (9th Cir.1987), *modified*, 856 F.2d 1391 (9th Cir.1988), the fact that it did not is not inconsistent with a finding that all were involved in the larger scheme as charged. The jury could simply have believed that the others did not "cause" or know of the discrete mailings charged in each count, or it could have misunderstood the instructions as meaning that it should only find the person who actually did the

---

9. Of the eighteen mail fraud counts, Frega was convicted on thirteen, Malkus on six, and Adams on five. Frega and Malkus were convicted on four common counts, and Frega and Adams on two common counts. Adams and Malkus were not convicted on any common counts (and, therefore, all three defendants were not convicted on any common counts).

mailing guilty on the count that charged that mailing.

Frega further claims that the court erred by failing to give a unanimity instruction because the possibility existed that the jury could have found multiple conspiracies. In the district court, he argued that there were two different schemes—one to bribe, the other to conceal. However, in textbook instructions, the jury was told that it had to find *a* scheme to defraud the people of the state of their right to honest services of superior court judges whereby Frega and Williams gave, and Adams, Malkus and Greer accepted, over one hundred thousand dollars in payments and benefits with intent to influence and reward California Superior Court judges. The jury was also told that it had to find that Frega and the judges used the mails to further the scheme. *Mastelotto*, upon which Frega relies, does not suggest that a different instruction was necessary. There, the instructions affirmatively invited conviction based on multiple schemes, and two distinct sorts of fraudulent transactions were involved (selling mislabeled oil at inflated prices, and sale of corporate subsidiaries based on inflated earnings). *See Mastelotto*, 717 F.2d at 1249–50. We reversed, because in those circumstances the jury should have been instructed that each juror had to find the defendant guilty of participation in the same single scheme to defraud, and that the scheme in which the defendant is found to have participated must be the same as the overall fraudulent scheme alleged in the indictment. *See id.* at 1249–51. Here, the instructions did not permit conviction based on a finding of different schemes, and unlike *Mastelotto*, bribery and concealing bribery are part and parcel of the same scheme. In sum, the court's repeated use of words such as "the" and "a" scheme, rather than "some" or "any," coupled with the direction that a verdict has to be unanimous, sufficiently informed the jury of the need to find a single scheme. *See United States v. Feldman*, 853 F.2d 648, 653–54 (9th Cir.1988).

Finally, Frega argues that the court should have instructed the jury that good faith was a complete defense to mail fraud charges. However, since the district court provided adequate instructions on the specific intent element of mail fraud, no good faith defense instruction was required. *See United States v. Sarno*, 73 F.3d 1470, 1487 (9th Cir.1995), *cert. denied*, 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1072 (1996) ("Notwithstanding the normal rules governing 'theory of defense' requests, the Ninth Circuit has held that 'the failure to give an instruction on "good faith" defense is not fatal so long as the court clearly instructed the jury as to the necessity of "specific intent" as an element of a crime.' ")(quoting *United States v. Solomon*, 825 F.2d 1292, 1297 (9th Cir.1987)).

Because the defendants offer no other challenges to their convictions on the mail fraud counts, we affirm those convictions.

## VI

The defendants also raise a number of challenges regarding the predicate acts— the state bribery charges—which form the "pattern of racketeering" necessary to the RICO conspiracy charge against them, as well as to the substantive RICO charge applicable only to Frega. In light of our disposition of the conspiracy charge, we need consider the arguments only insofar as they affect Frega's conviction on the substantive charge. The alleged errors relate to the following: the facial validity of the indictment; the sufficiency of the evidence regarding the predicate acts of bribery; the jury instructions regarding the predicate acts; and, the statute of limitations on those acts. The bulk of the claims regarding the bribery charges turn on the contention that those charges were defectively pled and proven because there was no link shown between a particular thing of value and a specific official act that was influenced or intended to be influ-

enced. For the reasons detailed below, we reject each and every claim of error relating to the predicate acts for the substantive RICO charge.

### A

▮▮ Frega argues that the indictment should have been dismissed as facially invalid because it failed to identify specific decisions or acts that he corruptly intended to influence by his financial generosity to the judges. The indictment charged that the payments and benefits Frega provided to the judges were intended to influence Adams and Malkus in their handling of Frega's cases in general. Prior to trial, the court denied defense counsels' motions to dismiss the indictment for facial invalidity.[10]

▮▮ Linkage between a payment and a specific official decision is not required under California bribery law.[11] California Penal Code §§ 92 and 93 make unlawful bribes intended to influence any matter "which is or may be brought" before a judge for decision.[12] A "bribe" is anything of value given or accepted with "a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." Cal.Penal Code § 7(6).[13] Therefore, a bribe intended to influence a case or decision not yet on a judge's docket, or intended to influence the assigning of cases, or intended to influence, generally, a judge's future actions with respect to matters that may come before him, falls within the statute's prohibitions. As the California Supreme Court observed in connection with another section of the Penal Code, which similarly makes unlawful the receipt of a bribe intended to affect consideration "of any question or matter, upon which [the official] may be required to act in his official capacity":

> The law does not require any specific action to be pending on the date the bribe is received.... The use of the word "may" suggests that payments designed to alter the outcome of any matter that could conceivably come before the official are within the prohibition of the statute.

*People v. Diedrich,* 31 Cal.3d 263, 182 Cal. Rptr. 354, 360, 643 P.2d 971 (1982) (en banc). *See also People v. Markham,* 64 Cal. 157, 159, 30 P. 620 (1883) (holding that the crime is complete when the payment is corruptly given with intent to influence the

---

**10.** We review the denial of a motion to dismiss an indictment for facial invalidity or insufficiency *de novo. See United States v. McClelland,* 72 F.3d 717, 721 (9th Cir.1995), *cert. denied,* 517 U.S. 1148, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996).

**11.** The requirements for establishing a violation of the California bribery statutes at issue here, California Penal Code §§ 92 and 93, thus differ from those for establishing a violation of the federal anti-gratuity statute, 18 U.S.C. § 201(c)(1)(A). In order to prove a violation of the latter statute, the Supreme Court recently held in *United States v. Sun–Diamond Growers of California,* — U.S. —, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999), the government must prove a link between a thing of value conferred upon a public official and a specific "official act" for or because of which it was given.

**12.** Section 92 provides:

Every person who gives or offers to give a bribe to any judicial officer, juror, referee, arbitrator, or umpire, or to any person who may be authorized by law to hear or determine any question or controversy, with intent to influence his vote, opinion, or decision upon any matter or question which is or may be brought before him for decision, is punishable by imprisonment in the state prison for two, three or four years.

Section 93 provides:

Every judicial officer ... who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his vote, opinion, or decision upon any matters or question which is or may be brought before him for decision, shall be influenced thereby, is punishable by imprisonment in the state prison for two, three or four years.

**13.** "The word 'corruptly' imports a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person." Cal.Penal Code § 7(3).

judicial officer on any matter that may by law come before him in his official capacity, whether or not it ever does).[14]

Because no linkage of payment and specific official act is required under California law and because the indictment incorporates the relevant state bribery statutes, which, in turn, state the elements of the bribery offenses, the indictment is valid in this respect.

### B

Frega also casts his quid pro quo argument as a challenge to whether the evidence was sufficient to establish that he had committed the predicate acts of bribery.[15] First, he contends that the evidence of bribery was insufficient because it did not show how a specific case was affected by a particular bribe, or that any "official conduct" occurred in any case because of any particular payment. As discussed above, this argument misapprehends the law: there is no requirement under the California bribery statutes that a judge *act*, let alone act *improperly*, in response to a bribe. *See, e.g., Markham,*

30 P. at 622. Second, Frega argues that much of the evidence introduced at trial did not pertain to "official acts" at all and should have been excluded on that ground. Examples of non-official acts by the judges include giving legal advice to Frega regarding his cases, evaluating their settlement value, reviewing legal documents to be filed, critiquing witness testimony before it was given, and granting Frega private access to the judges' chambers before, during, and after trial. While Frega may be correct that this evidence did not pertain to "official acts," he is wrong in his assertion that the court erred in admitting it. The evidence is probative of the relationship between Frega and the judges. Moreover, the jury was properly and repeatedly instructed that the bribes must have been intended to influence the judges' official actions.

### C.

Frega next argues that it was error to refuse his proposed instructions on the predicate state bribery acts.[16] His

---

14. Frega points to the standard California instruction on Penal Code §§ 92 and 93 offenses, which states that "[i]t is essential ... that the subject matter upon which the bribe is to operate actually exists and has been or can be brought before the officer in question in [his][her] official capacity," and that "the act sought to be influenced is within the general scope of the officer's duties." CALJIC No. 7.10. Whatever the meaning of that instruction, and it may indeed be ambiguous, it cannot serve to modify the statute or override the decisions of the California courts. It is those decisions that we must apply here. *See McDowell v. Calderon,* 130 F.3d 833, 840 (9th Cir.1997) (en banc) ("CALJIC's instructions are only recommendations and do not carry the force of law").

15. We review challenges to the sufficiency of the evidence adduced at trial to see whether, viewing the evidence in the light most favorable to the government, the jury could reasonably have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Laykin,* 886 F.2d 1534, 1539 (9th Cir.1989).

16. We review a district court's formulation of jury instructions for abuse of discretion. *See*

*United States v. Houser,* 130 F.3d 867, 869 n. 1 (9th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 2074, 141 L.Ed.2d 150 (1998). Whether a jury instruction misstates the elements of a statutory crime is a question of law and is reviewed de novo. *See United States v. Petrosian,* 126 F.3d 1232, 1233 n. 1 (9th Cir. 1997), *cert. denied,* — U.S. —, 118 S.Ct. 1101, 140 L.Ed.2d 156 (1998). In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. *See United States v. Moore,* 109 F.3d 1456, 1465 (9th Cir.) (en banc), *cert. denied,* — U.S. —, 118 S.Ct. 108, 139 L.Ed.2d 61 (1997). The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented. *See United States v. Garcia,* 37 F.3d 1359, 1364 (9th Cir.1994). A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *See United States v. Harrison,* 34 F.3d 886, 889 (9th Cir.1994). Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that they prejudiced the defendant. *See United States v. de Cruz,* 82 F.3d 856, 864–65 (9th Cir.1996).

proposed instructions set forth his theories that a bribe must be linked to a particular pending case; that he could be guilty of bribery only if a bribe was both offered and accepted with corrupt intent; that there is no bribery if the judges performed their duties in a manner that was otherwise correct, or if the payments to the judges were gifts, not bribes; that a payment to a family member is not a bribe if the judge is not made aware of the payment; and that certain conduct does not constitute "official action."

For the reasons we have already explained, linkage is not required and it would have been error to give Frega's proposed instruction to the contrary.[17] *See United States v. Jackson*, 72 F.3d 1370, 1376 (9th Cir.1995), *cert. denied*, 517 U.S. 1157, 116 S.Ct. 1546, 134 L.Ed.2d 649 (1996) (California bribery law does not require an explicit quid pro quo instruction). The proposed instruction requiring that both the offer and the acceptance be corrupt in order for Frega to be found guilty of bribery was also properly rejected; only *his* intent need be corrupt, not the recipient's. *See Markham*, 64 Cal. at 160–61, 30 P. 620. So too, the court had no obligation to instruct the jury that it could consider the fact that a particular judicial act was legally supportable and correct aside from the purported bribe; again, the crucial issue is Frega's intent in making the payment, not what the judge who accepts the payment believes or does. *Id.* We also do not see any problem with the court's instructions on Frega's theory that if his payments were gifts, no bribery occurred; although not in the precise words preferred by Frega, the court instructed that

> Even though giving a judge something of value may be inappropriate or a violation of the ethical rules ... such an act

is not done corruptly so as to constitute a bribery offense unless [it] is intended at the time it is given to affect a specific action the judge officially will take in a case before him, or may take in a case that may be brought before him.

> A gift or favor bestowed on a judge solely out of friendship, to promote good will, or for motive wholly unrelated to influence over official action does not violate the bribery statutes[.]

The instruction carefully set forth the distinction that Frega requested be drawn. *See United States v. Faust*, 850 F.2d 575, 583 (9th Cir.1988) (defendant not entitled to any particular form of instruction so long as instructions that are given fairly and adequately cover theory of defense). Next, the court's refusal to give Frega's proposed instruction as it pertained to gifts to members of the judges' families comports with the law. As we have previously made clear, what is critical to a finding that Frega committed the predicate acts for the substantive RICO charge is Frega's intent in making the payment, whether to a judge or to a member of the judge's family, not whether the judge was in fact aware of or influenced by the payment. Frega argues that *Willens v. Superior Court of San Joaquin County (Baker)*, 19 Cal.App.3d 356, 96 Cal.Rptr. 922 (Cal.App.1971), puts payments to family members beyond the reach of the bribery statute, but *Willens* involved not a family member, but an unrelated third party who said he could "fix" a case for $1000. *See* 19 Cal.App.3d at 359, 96 Cal.Rptr. 922. Finally, with respect to "official action," the district court was well within its discretion in declining to give an instruction on what does *not* constitute official action when it correctly instructed on what *does*.[18] the payments had to be for the purpose of influencing official actions.

> Nor does giving a judge something as a reward for an official act on his part that he has already taken constitute a bribe unless there was an understanding prior to the act being taken that the judge would be so rewarded.

---

**17.** Although Frega also complains in passing that the instructions allowed the jury improperly to convict him based on payments that were perceived as rewards for past acts, we do not understand how, as the instructions clearly stated:

**18.** The court's instruction defined "official ac-

## D

■ Finally, Frega contends that the statute of limitations had run on the substantive RICO charge because the statute provides that at least one predicate act must have occurred within five years of the filing of the indictment. 18 U.S.C. § 3282. The indictment listed 24 predicate acts of alleged bribery under California Penal Code § 92, only three of which (Racketeering Acts 22, payment of the $1,000 bill for a rental car used by Adams's daughter, Lindsay; 23, payment of the $1,500 bill for repairs to the Jeep Lindsay owned; and 24, payment of $5,250 towards the purchase of a Saab for Greer) were alleged to have occurred within the statute of limitations period. Frega argues that none of these three predicate acts is legally sufficient under the California bribery statute, and, therefore, that the statute of limitations was violated.

Frega's claim that these three acts are legally insufficient reiterates his arguments that the California bribery statute requires that a bribe be intended to influence a particular decision and that payments to the judges' families do not constitute bribes. We have already rejected both of these arguments.

Because Frega offers no other challenge to his conviction on the substantive RICO count, we affirm that conviction.

## VII

Frega, Adams and Malkus contest their RICO conspiracy convictions on a variety of grounds. Because we reverse those convictions due to instructional error, we do not consider their other contentions.[19]

■ Defendants claim that the judge's response to an inquiry from the jury re-

garding what predicate acts could constitute the pattern of racketeering underlying the RICO conspiracy charge was unresponsive, misleading and legally incorrect. We agree. The district court's response not only failed to ameliorate, but exacerbated, the jury's expressed confusion, thereby creating a strong possibility that the jury verdict was based on legally inadequate evidence. Accordingly, we reverse the defendants' convictions on the RICO conspiracy charges.

The disputed instruction was given in response to a note that the jury sent to the district judge during deliberations asking what predicate racketeering acts it could consider for Count One, the RICO conspiracy charge. The jury's note read: "Are racketeering acts in Court's Instruction 39 only applicable to Count 20 or are they also used in Count 1? Are the racketeering acts in Court's Instruction 39 the only racketeering acts to be used in Count 1?" The jury had received an instruction (Number 39) listing the predicate racketeering acts for Count 20 (the substantive RICO count, applicable only to defendant Frega), but no analogous instruction for Count 1 (the RICO conspiracy charge, applicable to all three defendants).

At a highly contentious conference at which all counsel were present, the judge informed the lawyers of the response he was planning to give to the question from the jury: in pertinent part, that the list of racketeering acts it had received (Instruction 39) applied only to Count 20, but that "all of the evidence that you have heard or seen during the trial may be considered by you as to all counts." The defendants' lawyers pointed out that the jury's note showed that it did not know what acts it

tion" as follows:

> Official acts of a judge are those that are done by the judge in his official capacity under color and by virtue of his office or which properly belong to the office and are intended by the officer to be official.

19. We note that there is a substantial question whether there could be a single conspiracy consisting of bribery (both giving and receiving) and extortion, as the indictment charged, considering that Frega could not have conspired to extort money from himself. Because of our disposition, we do not reach this issue.

could consider as predicate racketeering acts for the conspiracy charge, and that the judge would be giving it erroneous and misleading information. Defense counsel requested that the judge answer, "Yes, the only racketeering acts [you] can consider are the ones that are contained in ... Count 20." The prosecutor agreed and made a similar request. Defense counsel also specifically objected to the "all of the evidence" portion of the judge's answer as confusing and unresponsive to the jury's questions.[20] The judge rejected the response that the parties agreed was proper, overrode the objections to his proposed answer, and sent it to the jury. Defendant Frega immediately moved for a mistrial; the judge denied his motion. After further deliberation, the jury returned a verdict of guilty as to all of the defendants on the RICO conspiracy charge.

In the original instructions, the jury was advised that in order to convict Frega, Adams and Malkus on the RICO conspiracy count it had to find that each defendant agreed to conduct the affairs of the court through a pattern of racketeering activity consisting of at least two predicate acts. What it had not been told was what conduct could constitute predicate acts for that count: the jury instructions for the RICO conspiracy charge did not identify any predicate racketeering acts, nor did the indictment list any such acts when setting forth that charge. The *only* predicate racketeering acts specified were set forth in the sections of the indictment and the jury instructions that pertained to the substantive RICO count, which applied only to Frega. The jury clearly expressed its confusion as to what conduct could constitute the requisite predicate acts for the RICO conspiracy charge, asked whether the predicate acts specified in Instruction 39 applied to the conspiracy count and explicitly requested clarification from the trial judge on this point. *See United*

*States v. Walker,* 575 F.2d 209, 213 (9th Cir.1978) (on appeal, we may infer from questions asked by the jury that it was confused about a controlling legal principle).

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946); *see also McDowell v. Calderon,* 130 F.3d 833, 839 (9th Cir.1997) (en banc) (the trial court has a "duty to respond to the jury's request with sufficient specificity to clarify the jury's problem"). We must, accordingly, inquire into whether in this case the district judge fulfilled his responsibility to eliminate the jury's confusion. *See United States v. Hayes,* 794 F.2d 1348, 1352 (9th Cir.1986).

In this instance, what the jury needed in order to dissipate its confusion was the answer: yes, the predicate acts listed in Instruction 39 are applicable to the RICO conspiracy charge; or, at the least, an explanation of how the jury could identify the acts that could properly serve as the predicates for that charge. In his response, the district judge did not identify any predicate acts that the jury could rely upon for the RICO conspiracy charge. Instead, he told the jury, erroneously, that it could not rely on the *only* predicate acts that had been set forth in the indictment and the jury instructions—the only predicate acts concerning which evidence had been presented during the trial—the very acts that the jury correctly thought might be the ones it should use. The court's erroneous response left the jury with the task of identifying, and unanimously agreeing upon, at least two acts of bribery, forming the "pattern of racketeering activity"—apart from the twenty-four specific acts of bribery involving Frega's unlawful

**20.** One of the three defense counsel limited his objection to this part of the proposed answer, apparently agreeing with the judge's answer regarding predicate acts—probably with the thought that this would leave the jury without *any* such acts on which to base a RICO conspiracy conviction.

payments to the judges. The government in its brief identifies no such additional acts. Moreover, the district judge expanded on his answer, telling the jury that it could consider "all of the evidence that [it had] heard or seen during the trial ... as to all counts." This expansion was certain to further confuse and mislead the jury, given that it had nothing to do with the jury's question, or indeed with what constitutes a predicate act.[21]

Because the jury here expressed confusion about the acts upon which it could properly base its verdict on the conspiracy charge, we must be concerned about whether the jury verdict was based on conduct that was legally adequate for the purpose. Given the judge's answer to the jury's inquiry and, in particular, his exclusion of the predicate acts of bribery specified in Count 20 from the jury's consideration, the jurors may well have rendered a verdict of guilty as to the RICO conspiracy charge based on conduct that could not constitute predicate acts. The jury may have relied on acts of mail fraud that were not predicate acts or on acts listed in Count 1 that were "overt" but not "predicate." That is, among "all the evidence" the jury was instructed to consider in response to its questions regarding predicate acts was evidence of acts that were wrongful but could not qualify as predicates for the RICO conspiracy charge.

As the Supreme Court has said, "[w]hen ... jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from error." *Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); *see also United States v. Barona*, 56 F.3d 1087, 1097–98 (9th Cir.1995) (where the jury is presented with a legally inadequate theory, the conviction must be vacated). Because the jury was not given the opportunity to identify which predicate acts it relied upon, we cannot be sure that the verdict on the RICO conspiracy charge was based on legally adequate evidence. Even less, given the confusing and misleading nature of the district court's response, can we assume that all members of the jury convicted the defendants on that charge on the basis of the same acts, and, thus, that the defendants' right to a unanimous jury verdict as guaranteed by article III, § 2 and the sixth amendment to the United States Constitution was not infringed. *See United States v. Gordon*, 844 F.2d 1397, 1400–01 (9th Cir.1988); *United States v. Echeverry*, 698 F.2d 375, 377 (9th Cir.1983).

The Supreme Court has clearly stated that it is reversible error for a trial judge to give an answer to a jury's question that is misleading, unresponsive, or legally incorrect. *Bollenbach*, 326 U.S. at 612–13, 66 S.Ct. 402. The answer given here was all three. Moreover, in a case of this nature, involving a highly complex statute, multiple charges and defendants, allegations of a conspiracy, a number of subsidiary legal issues, and highly disputed facts (as well as a second set of counts involving the application of a second federal statute), the danger of jury confusion is especially great and the district court's responsibility

---

21. We agree with the dissent that under *Salinas* and *Tille* each individual defendant need not "commit or agree to commit *the two or more predicate acts requisite to the underlying offense.*" *Salinas v. United States*, 522 U.S. 52, ——, 118 S.Ct. 469, 478, 139 L.Ed.2d 352 (1997) (emphasis added); dissent at 821. In other words, in order to convict a defendant on a RICO conspiracy charge, our case law "does not require proof that [he] participated personally, or agreed to participate personally, in two predicate offenses." *United States*

v. *Tille*, 729 F.2d 615, 619 (9th Cir.1984); dissent at 821. Rather, as the dissent acknowledges, the conspiracy must contemplate the commission of two predicate acts by one or more of its members. Dissent at 820. Thus, the principles recited by the dissent are correct but irrelevant to the present dispute, which involves not whether each defendant agreed to participate personally in each predicate act, but what predicate acts the jury could properly find had been agreed to by the conspirators, regardless of which member might perform them.

to provide clarification particularly acute. Under the law of this Circuit, the convictions on the RICO conspiracy count must be reversed. *See McDowell,* 130 F.3d 833; *United States v. Walker,* 575 F.2d 209, 214 (9th Cir.1978).

## VIII

■■■■ Finally, the United States cross-appeals from the sentences on the ground that the district court misinterpreted and misapplied the Sentencing Guidelines.[22] We see no basis for reversal, as the court did not clearly err in its findings.

■■■ The government first contends that Frega should have received a four-level sentencing enhancement under U.S.S.G. § 3B1.1(a) as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The district court found to the contrary:

> The evidence in this case was that all defendants were in effect in it together. There was not one leader supervising or directing the activities of the others. It is hard for the Court to conclude that Mr. Frega here was an organizer.... That certainly is not consistent with the evidence presented in court and therefore the Court does not find this to be an appropriate departure.

In the government's view, all the factors a court is to consider in determining wheth-er an individual was an organizer or leader point to an enhancement for Frega. *See United States v. Ponce,* 51 F.3d 820, 827 (9th Cir.1995) (identifying factors). Certainly there is evidence that Frega was the scheme's central actor, having bankrolled it, profited from it, involved other participants, and exercised control over co-conspirators. However, there is support for the district court's assessment as well. Frega was in no position to coerce any of the judges into rendering favorable decisions and, in fact, often played the role of errand boy. Indeed, he complained about Adams being demanding. Williams substantially contributed to the funding of the conspiracy by providing discounted cars and car repairs. Frega did not necessarily have a "claimed right" to a larger share of the pie. And while he started the scheme by doing favors for Greer, and then the others, we cannot say that the trial judge erred in finding that while the scheme started with Frega trying to ingratiate himself with the judges, the pattern developed into a corrupt enterprise with all of the parties·more or less equally involved. As the call could go either way, the district court did not abuse its discretion in finding that Frega was not an organizer or leader such as to warrant the enhancement.

■■■ Next, the government seeks resentencing because the court enhanced each sentence by eight levels under

---

**22.** We review de novo the district court's interpretation of the Sentencing Guidelines. *See United States v. Bailey,* 139 F.3d 667, 667 (9th Cir.1998). The district court's factual findings in the sentencing phase are reviewed for clear error. *See United States v. Ladum,* 141 F.3d 1328, 1344 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998). However, factual findings by the court must be supported by a preponderance of the evidence. *See United States v. Collins,* 109 F.3d 1413, 1420 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 183, 139 L.Ed.2d 123 (1997). The district court's application of the Guidelines to the facts of a particular case is reviewed for an abuse of discretion. *See United States v. Aguilar–Ayala,* 120 F.3d 176, 177–78 (9th Cir. 1997). Moreover, "[a]lthough the [Sentenc-ing Guidelines] established a limited appellate review of sentencing decisions, it did not alter a court of appeals' traditional deference to a district court's exercise of its sentencing discretion. The selection of the appropriate sentence from within the guideline range, as well as the decision to depart from the range in certain circumstances, are decisions that are left solely to the sentencing court." *Williams v. United States,* 503 U.S. 193, 205, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). A district court's decision to depart from the Guidelines is reviewed under an abuse of discretion standard. *See Koon v. United States,* 518 U.S. 81, 98–100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). A district court's discretionary refusal to depart from the Sentencing Guidelines is not reviewable on appeal. *See United States v. Tucker,* 133 F.3d 1208, 1214 (9th Cir.1998).

U.S.S.G. § 2C1.1(b)(2)(B),[23] rather than by fourteen levels under U.S.S.G. § 2C1.1(b)(2)(A), as the government had suggested.[24] The government's calculation was based on the sum of the judgments won by Frega clients adjudicating their claims in the courts of Adams and Malkus, which amounted to over $5 million. In the alternative, the government proposed that the § 2C1.1(b)(2)(A) offense level be calculated based on the attorneys' fees received by Frega in the tainted cases, which amounted to at least $9 million and would also have corresponded to a fourteen-level upward enhancement.

We cannot say that the district court clearly erred in finding insufficient evidence to rely on the dollar figure of favorable monetary judgments as a reasonable measure of benefit. The government did not (and did not have to) connect any particular payment with any particular result. Nor was there any basis in the record for relating the amount of benefit to Frega's attorneys' fees. Rather, the court was well within its discretion in finding that the value of the payments to Greer, Adams, and Malkus—$110,078—was the value of the improper benefit accrued under § 2C1.1(b)(2)(A).

The government also contends that the court could have calculated the amount of benefit Frega intended or expected to receive from his bribes by calculating either the amount of the judgments Frega expected to secure his clients through bribery, or the amount of attorneys' fees Frega expected to receive from cases tainted with bribery. Again, however, the district court did not abuse its discretion in finding no basis in the record for reasonably determining "but for" benefit. The Seventh Circuit's decision in *United States v. Mu-*

*hammad,* 120 F.3d 688 (7th Cir.1997), which the government urges us to follow, is not to the contrary. The district court in that case did have a reasonable basis for calculating the benefit of a bribe to a juror, namely the amount the litigant would not have had to pay had the juror succeeded in influencing the jury. *See id.* at 700–01.

Finally, the government argues that the effect of the crimes in shaking the public's confidence in the legal system warrants an upward departure under U.S.S.G. § 2C1.1. However, the district court's discretionary decision not to depart from the Sentencing Guidelines is not reviewable on appeal. *See Tucker,* 133 F.3d at 1214.

### Conclusion

For the reasons set forth above, we reverse the convictions on Count 1 and affirm the convictions on all other counts.

REVERSED IN PART; AFFIRMED IN PART; REMANDED FOR RECONSIDERATION OF THE DEFENDANTS' SENTENCES IN LIGHT OF THIS OPINION.

RYMER, Circuit Judge, concurring in part and dissenting in part:

Because the district judge correctly instructed on RICO conspiracy, but the majority holds otherwise, I dissent from Part VII. This requires me to consider other RICO challenges that the majority avoids, but which the district court also properly resolved. Finally, since the facts matter and must be viewed in light of the guilty verdict, I set them out in full. They provide context for the entire case as well as for the RICO conspiracy.

---

**23.** U.S.S.G. § 2C1.1(b)(2)(B) provides:
 If the offense involved a payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position, increase by 8 levels.

**24.** U.S.S.G. § 2C1.1(b)(2)(A) provides:

If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase by the corresponding number of levels from the table in § 2F1.1 (Fraud and Deceit).

I

Patrick Frega was a high-profile, San Diego plaintiff's lawyer who initiated a scheme to bribe former California Superior Court Judges Michael Greer, James Malkus, and Dennis Adams. From 1984 until 1991, Frega and co-conspirator Jim Williams disbursed over $100,000 in payments and benefits to the judges in exchange for unfair advantage in Frega's cases. The three judges worked together to divert Frega's cases or settlement proceedings to the judge's calendar of Frega's choice.

The conspiracy began with the close friendship that developed between Frega and Greer in the early 1980's. The pair met and dined frequently with one another, and their conversation often focused on Frega's high-stakes cases. Following one occasion when Frega brought his client to Greer's chambers for a mock cross-examination, Frega started doing favors for Greer. Frega had Greer's car cleaned up and repaired, and arranged for the purchase of a Toyota for Greer's daughter at less than market price. He handled six lawsuits for the Greer family at no charge. When he lost a warranty claim for Greer against Volkswagen for a broken clutch, Frega paid Greer $2400 for a $350 repair and covered the cost of the $5000 settlement. Greer reciprocated in 1985 while presiding over the settlement of a legal malpractice suit brought against Frega. After discussing the case with Frega, Greer conducted the settlement conference "as efficiently as possible for Mr. Frega," so Frega would pay as little as possible.

In 1986, Frega won a multi-million dollar judgment for Williams, who owned and operated a local automobile dealership. Williams was so appreciative that he told his fleet manager that "Whatever Mr. Frega wants, Mr. Frega gets." Frega asked for a Mercedes for Greer, which the dealership got for $24,870. Greer wrote a check for $12,000 and Frega contributed the $12,870 balance. As Greer drove the car away, he recalled "having a sick feeling in my stomach." As he testified, "I knew I was in trouble when I took that Mercedes."

Frega bought or subsidized three more cars for the Greer family: two Saabs, one of which he listed as a "cost of case" on his firm's books, and another Toyota for Greer's daughter, which he also charged as an office expense. Whenever any of Greer's cars needed repair, Greer or Frega brought them to Williams's dealership and Frega paid the bills. At some point, Frega told the fleet manager just to put Greer repairs on his tab; but on one occasion, Frega told him to put a copy of the repair order on the seat of Greer's car as a reminder of who was paying for the bills.

In sum, from 1986 until 1992, Frega paid over $40,000 toward the purchase of cars for Greer and $8,290 in repairs. Frega also paid $830 for a one-year membership at the Cuyamaca Health Club for Greer, and later paid the judge's dues at a downtown facility. In addition, Frega gave Greer's daughter a $3,000 Caribbean cruise as a wedding gift, which Frega recorded in his law firm's books as a "cost of case."

All the while, Greer presided over Frega's cases. As he put it, "we were taking care of each other at that point." He decided motions in Frega's favor, and met with Frega before each Frega settlement conference to discuss how much Frega wanted to settle for and to strategize how the conference could best be conducted for Frega's benefit. Greer then "pressured only one side, not the other."

When Greer was presiding judge in 1988–89, he was in a position to, and did, assign Frega's cases to the judges of Frega's choosing: Judges Malkus and Adams. Both had joined the San Diego Superior Court in 1979 and thereafter developed a close affiliation with Greer and Frega.

Beginning in the early 1980's, Malkus joined Frega and Greer for lunch on a weekly or biweekly basis. At these lunches, the threesome discussed Frega's

cases, including those pending before Malkus. Malkus allowed Frega special access to chambers while Frega had cases pending in his court. Malkus instructed his bailiff not to announce Frega's arrival or to clear visits in advance, as was standard operating procedure. During trials, Malkus directed his bailiff to take precautions to ensure that Frega's visits went undetected. In order to abide by Malkus's requests, the bailiff devised an elaborate route through the courthouse for Frega to follow, something he had never done before in his fourteen years on the job. When Malkus's clerk inquired about the meetings between Malkus and Frega, the judge told her not to worry about it.

In May 1986, Frega provided Malkus with the same health club membership he had given Greer. That same month, Malkus presided over a multi-plaintiff case, *Dominelli*, in which Frega was one of the attorneys and Greer was one of the plaintiffs. Before and during trial, Frega, Greer, and Malkus discussed the case during their regular luncheons. Frega told an associate that he favored waiving the jury because "he had control."

In August 1987, Frega had Greer (who was sitting in for the presiding judge during that month) assign *Jennings, Engstrand & Henrikson v. MacLarty* to Malkus. While Malkus presided over *Jennings,* Frega paid for over $3,500 in repairs on Malkus's Cadillac. Malkus ruled on several motions before the case settled for over $1 million.

In July 1989, Frega asked Greer to assign another of his cases, *Romero v. Stevenson,* to Malkus for trial. Greer discussed the proposed assignment with Malkus, who accepted it notwithstanding his heavy caseload. The assignment caught the attention of Malkus's clerk who asked the judge why he was being assigned so many Frega cases. Malkus explained that "Greer and Frega are kiting cases," meaning that "Greer is sending them to friendly courts." Malkus also confided that he was "vulnerable" to Frega. On the eve of trial, Frega had an employee buy a car for Malkus's college-bound son, Todd. Frega wrote the word "Romero" on the check, and told the employee to bill his time, mileage, and expenses in obtaining the car to *Romero.* Todd reimbursed Frega for only half of the cost. The night before the trial was to begin, Frega called Malkus at his home at 8:55 p.m. and they talked for eight minutes; Malkus then called Frega at 9:36 p.m. and they talked for twelve minutes. After hanging up, Frega called his associate. The next morning Frega's associate tried to waive a jury trial, but the defendant did not agree. Frega and Malkus spoke on the telephone over twenty more times during the *Romero* trial, including one call to Malkus's home on the day before Malkus entered judgment. Frega also talked to Greer and Adams before, during, and after the trial.

Also in 1989, Frega assumed control of another multi-million dollar case, *Pressley's Truck Center v. Bank of America,* from a relatively inexperienced practitioner, whom he retained as counsel of record to conceal his involvement. Frega asked Greer to assign the case to Malkus and to tell Malkus that Frega was plaintiff's counsel. Upon learning that *Pressley* was a Frega case, Malkus accepted the assignment from Greer. Malkus also became aware that one of the attorneys arguing a motion, who was introduced to the court as an associate of the counsel of record, was in reality an associate of Frega's. There was a fifteen minute call from Frega to Malkus's home the night before the hearing. Malkus did not disclose to opposing counsel his knowledge of Frega's involvement in *Pressley* or his own relationship with Frega.

Several months after *Pressley* was assigned to Malkus, Frega secured a job for Todd Malkus at a private investigation firm that was a former Frega client. Frega offered to pay Todd's salary at a rate $500 more per month than the firm's other investigators. The firm agreed, and as a

result, over the course of the next several months, Frega paid the firm approximately $10,000 as reimbursement for Todd's salary. Frega recorded the payments as business expenses, and wrote the words "Pressley v. BOA" on two of the checks covering the salary.

Frega instructed counsel of record to waive the jury in *Pressley.* The defendant agreed, and a bench trial was held. Though the jury had been waived, Frega and Malkus continued their in-chambers meetings and ex parte telephone conversations throughout the proceedings. Malkus told Greer that he and Frega were privately discussing *Pressley,* and when Greer told Malkus that he thought it was risky to have such discussions in a case where the jury had been waived, Malkus responded that he didn't think there was a problem.

On March 21, 1991, while the *Pressley* trial was in process, there was a 20–minute phone conversation from Frega's office to Malkus's chambers. The next day, Frega purchased and delivered two $1000 money orders to Todd Malkus. From the close of evidence on September 2 until Malkus entered his proposed decision on October 9, Frega and Malkus spoke on the telephone twenty-six times, including one 21–minute call the day before judgment was issued. Malkus awarded Frega's client over $4 million.

Finally, Frega had Greer assign another one of his cases, *Berman v. McKellar,* to Malkus. As in *Pressley,* the three worked together to ensure that Frega's involvement in *Berman* was a secret. After granting the continuance sought by Frega's client, Malkus delivered the case file to Adams, though the matter had been reassigned to another judge, and Adams settled it for $2 million.

Frega's relationship with Adams developed in early 1986 when Frega represented Williams in the bench trial of *Security Pacific National Bank v. Williams,* over which Adams presided. Frega consulted Greer almost daily during trial. Greer, in turn, was in touch with Adams during the

trial and relayed Adams's reactions on the case to Frega. Then, before he issued his initial decision in February 1986, Adams delivered a draft to Greer. Thereafter, Greer met twice with Frega behind closed doors. Before the decision was announced, Frega revealed to an associate that he had won the case and that the award would be approximately $4.5 million. The actual award was $5 million. Frega later told another associate that Adams, Greer, and Malkus had collaborated on several drafts of the opinion to ensure that it survived appeal. During the appeal, Frega wrote ex parte letters to Adams and Greer, requesting help on the case. After all appeals had been exhausted, Frega wrote to Adams thanking him for all his hard work and promising that he would "not be forgotten."

Beginning in 1987, while the appeal of the *Security Pacific* judgment was pending, Frega paid over $1500 for a ghost writer to assist Adams on a war novel the judge was writing. Frega also covered the writer's airline and hotel expenses and supplied Adams with a $2000 computer for the project. Frega recorded all of these as case-related expenses in his law firm's books. Also in 1987, Williams's dealership sold a van to Adams's father at dealer's cost, a portion of which was paid for by Frega. Frega himself presented the van at a Christmas Eve gathering at Adams's home. Frega recorded the van cost as a case-related expense on his law firm's ledger.

Meanwhile, Adams presided over the settlement of numerous Frega cases. Apart from settlement conferences, Adams also ruled on a cross-complaint, issued a discovery order, ordered various cases consolidated, and set trial dates in Frega cases. In February 1988, Frega asked Greer to assign a large-scale case, *Aegea Homeowners Association v. Harbor View Incorporated,* to Adams. Greer obliged, and Adams accepted. When Adams separated from his wife later that year, Frega

instructed an employee to set up an apartment for him. The employee moved in furniture and a television, turned on the electricity and gas, installed the telephones, and stocked the refrigerator. While *Aegea* was still pending before Adams, Frega also arranged and paid for Adams's Mercedes to be detailed, and then did the same for Adams's girlfriend's car. In addition, Frega paid for and delivered a car cover for Adams's Mercedes.

In September 1989, Adams ordered and presided over a mandatory settlement conference in *Aegea*. Shortly thereafter, Frega had an employee purchase a queen-sized bed for Adams. After picking up the bed, the employee met Frega and Adams where they were lunching, and the threesome then delivered the bed to the condominium of Adams's girlfriend. Frega charged the lunch to the *Aegea* case and billed the bed and his employee's time as office expenses. A few days later, Frega had this same employee pick up a large-screen television from Adams's family residence for repairs. *Aegea* settled before Adams for over $1.5 million.

In March 1986, Adams had retained jurisdiction over *Security Pacific* in order to determine attorneys' fees and costs on appeal, something he admitted he had never done in any other case. Adams conceded that he took these actions to force the bank to settle. After the appeals in *Security Pacific* ran their course in 1989, the bank purposely avoided a hearing before Adams on the question of fees and costs, instead settling for $7 million. Frega's fee was $2.8 million.

Following the *Security Pacific* settlement, Adams took his cars to Williams's dealership for a series of repairs that amounted to more than $6,000 on four separate automobiles. Williams absorbed all of these costs. Later that year, when Adams's daughter Lindsay needed a car, Frega provided over $4,000 toward the cost of a Jeep Cherokee. On his check to Williams for the car, Frega wrote the words "Williams v. SPBN."

On a number of occasions throughout 1988–1990, Frega discussed his payments to Adams with Greer. He told Greer about the Mercedes, the computer, and the apartment, and complained to Greer that Adams was demanding.

In 1991, Adams brought his Mercedes to Williams's dealership for repairs. He walked Williams's fleet manager and Frega around the car, describing the work he wanted done. Frega told the fleet manager that he would cover all the costs associated with the repairs and instructed that the finished car be delivered to his office. Later in 1991, Frega talked to Greer about settling *Berman*, a case originally assigned to Malkus at Frega's request. Two weeks later, it came before Adams for a mandatory settlement conference. An hour and a half before the settlement conference, Adams and Frega spoke over the telephone. Shortly thereafter, Lindsay Adams brought her Jeep to Williams's dealership for repairs. While the vehicle was being repaired, and within a week of the conference, Frega paid over $1000 for a rental car for Lindsay and disbursed $1500 toward the repair of Lindsay's Jeep. *Berman* settled for $2 million.

Eventually, the enterprise came under suspicion. In 1991, the California Commission on Judicial Performance opened an investigation after receiving reports of possible ethical violations. In response, Frega, Williams, Greer, Adams, and Malkus orchestrated a cover-up. Williams backdated or altered documents to conceal the connection between Frega and the judges. Frega initially represented Greer. Frega and Greer spent a day composing false answers to the Commission's preliminary questions. Greer falsely testified to the Commission that Frega had never appeared before him on a pleading nor was he likely to appear before him. He further stated that if Frega had appeared before him in court, he would have recused himself. Frega then suggested that Greer convince Malkus and Adams to provide

similar false answers. Adams denied receiving anything of value from Frega in 1991 and said that Frega did not appear in front of him and that he would not have heard any of his cases. Malkus and Greer falsely stated that their health club memberships had come from the Cuyamaca Health Club; this was consistent with statements both made in 1987 disclosure forms because they believed, as Greer testified, it "would look better with regard to our relationship publicly." Malkus tore out pages from his clerk's official minute books relating to Frega cases, then instructed his clerk and his bailiff to remove entire minute books from the courthouse. Though the clerk initially agreed, she had a change of heart and ended up locking the books in a cabinet without telling Malkus.

Greer and Malkus resigned during the course of the investigation. In 1995, on the Commission's recommendation, the California Supreme Court removed Adams from office.

After Greer became a prosecution witness, and after federal bribery charges had been dismissed, the grand jury returned a second superseding indictment charging Frega, Malkus, and Adams with RICO conspiracy in violation of 18 U.S.C. § 1962(d) (Count One), and with mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 (Counts Two–Nineteen). Additionally, the grand jury charged Frega in Count

Twenty with a substantive RICO offense in violation of 18 U.S.C. § 1962(c), and in Count Twenty–One with forfeiture allegations pursuant to 18 U.S.C. § 1963.

The jury found Frega, Malkus, and Adams guilty of the RICO conspiracy charge. Frega was convicted on thirteen mail fraud counts, Adams of five mail fraud counts, and Malkus of six mail fraud counts. The jury also found Frega guilty of committing the substantive RICO offense.

## II

Adams, Malkus and Frega challenge their RICO conspiracy convictions on a number of grounds. I start with the question of variance, as it requires discussion of what a RICO conspiracy is in relation to this case.

## A

Adams and Malkus argue that there was a prejudicial variance between Count One of the indictment-which charged a conspiracy among Frega, Greer, Malkus, Adams and Williams to participate in the affairs of the California Superior Court through a pattern of bribery and extortion-and the proof at trial, which they alleged showed multiple conspiracies instead of the single conspiracy set out in the indictment.[1] Adams submits that Greer never testified that he engaged in a

1. We review the question whether there was a material variance or constructive amendment de novo. *See United States v. Pisello*, 877 F.2d 762, 764, 765 (9th Cir.1989). The claim that a single conspiracy, rather than multiple conspiracies, has been proved is a question of the sufficiency of the evidence. *See United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir. 1984). In reviewing a claim for insufficient evidence, this court must determine if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found a single conspiracy beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Divergences of trial proof from an indictment can range from an insignificant variance constituting harmless error to a constructive amendment that broadens the indictment. *See United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir.1991). While a material variance occurs when the charging terms of an indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment, a constructive amendment occurs when the charging terms of the indictment are in effect altered by the prosecutor or court after the grand jury has last passed on them. *See United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir.1984). A variance warrants reversal only if it affects the substantial rights of a defendant, while a constructive amendment always requires reversal. *See Pisello*, 877 F.2d at 765.

scheme to corrupt Judge Malkus's or Judge Adams's office; that Adams could not have agreed to participate in a RICO conspiracy before January 1986 and did not agree to or participate in two predicate offenses; that after the *Williams* decision Adams's only activity in relation to Frega clients consisted of settlement conferences; and that in any event, the evidence showed three distinct conspiracies (one between Frega, Greer and Williams; a second between Frega, Adams and Williams; and a third between Frega, Malkus and Williams), each originating at separate times. Both Malkus and Frega point out that the indictment charged a conspiracy beginning in 1983 and continuing through 1995, although Malkus, Greer, and Adams each developed a relationship with Frega and Williams at different times. Malkus alternatively argues that the indictment was constructively amended, for essentially the same reasons. He also maintains that the prejudicial effect of the variance is apparent from the fact that each defendant pursued a defense of lack of any official or judicial *quid pro quo*, while the government's theory shifted to purely personal acts of accepting gifts

without corrupt intent by the judges.[2] I disagree that there was any material variance or constructive amendment.

The heart of a RICO conspiracy is an agreement to participate in the affairs of an enterprise (here, the superior court) through a pattern of racketeering activity (here, bribes). *See United States v. Tille*, 729 F.2d 615, 619 (9th Cir.1984). Although we have not had to decide whether "the enterprise concept in RICO supplants conventional conspiracy doctrine and defeats ... multiple conspiracy objections," *United States v. Zemek*, 634 F.2d 1159, 1169 (9th Cir.1980),[3] and we would not have to now, it is clear that RICO conspiracy is "more comprehensive" than a general conspiracy.[4] *See Salinas v. United States*, 522 U.S. 52, ——, 118 S. Ct. 469, 476, 139 L.Ed.2d 352 (1997). Unlike most ordinary conspirators, RICO conspirators do not need to commit, or agree to commit, overt acts; they just need to agree on the overall objective of the conspiracy (here, corrupt use of the superior court through bribery) with knowledge that others are similarly agreeing. *See id.* at ——–——, 118 S.Ct. at 476–78.

**2.** Malkus also seems to suggest that counsel was ineffective in pursuing the government's theory that a corrupt meeting of the minds specifically connected to a clearly identified official act occurred. To the extent he does so, I would leave that issue to collateral review because the record on that point is not sufficiently developed to permit review and resolution of the issue. *See United States v. Robinson*, 967 F.2d 287, 290–91 (9th Cir. 1992).

**3.** Other circuits have either eviscerated or eliminated the potency of a multiple conspiracy defense to a RICO conspiracy indictment. *See United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir.1993) (stating that a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single enterprise conspiracy if the defendants have agreed to commit a substantive RICO offense); *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.1984) (holding that § 1962(d) does not violate the principle prohibiting conviction of multiple conspiracies under an indictment charging a

single conspiracy); *United States v. Sutherland*, 656 F.2d 1181, 1194 (5th Cir. Unit A Sept.1981) (holding same as *Carrozza* ); *United States v. Maloney*, 71 F.3d 645, 664 (7th Cir.1995) (holding that § 1962(d) links in one proceeding a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy); *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991) (holding that the notion of enterprise conspiracy has largely rendered the old distinction between "single conspiracy" and "multiple conspiracy" irrelevant to RICO conspiracy charges).

**4.** As the Second Circuit has explained,

> So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other "does not convert the single agreement to conduct the affairs of an enterprise through a pattern of racketeering activity into multiple conspiracies."

*United States v. Friedman*, 854 F.2d 535, 562–63 (citations omitted).

Basic principles answer most of the arguments asserted. A single conspiracy may involve several subagreements or subgroups of conspirators. *See Bibbero,* 749 F.2d at 587 (citations omitted). A formal agreement is not necessary, but agreement may be inferred from the defendants' acts pursuant to the scheme or other circumstantial evidence. *Id.* It does not matter that some conspirators may not have known, or agreed, with each other. *Id.* As we have explained:

> [a] mere change in participants and a lapse in time, without more, are insufficient to support a finding of multiple conspiracies. Every member of the conspiracy need not know every other member nor be aware of all acts committed in furtherance of the conspiracy. Finding multiple conspiracies requires some evidence of separate agreements and purposes.

*United States v. Taren–Palma,* 997 F.2d 525, 530 (9th Cir.1993) (citations omitted). Finally, a variance as to starting date does not matter, as time is not a material element of the RICO offense. *See United States v. Ramos–Oseguera,* 120 F.3d 1028, 1035 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1094, 140 L.Ed.2d 149 (1998).

Viewing the evidence in the light most favorable to the government, as we must on appeal, I believe that a rational trier of fact could find a single overall conspiracy beyond a reasonable doubt. The factors we normally use to distinguish a single conspiracy from multiple conspiracies all support the existence of a single RICO conspiracy here. *See Tille,* 729 F.2d at 621 (discussing factors). The nature of the scheme was the same and interlocking, as Greer would act on Frega's request to assign his cases to Malkus (for trial) or Adams (for settlement), and each would accept the assignment knowing that Frega was providing gifts and services of substantial value, primarily through Williams's dealership. Although each conspirator became involved at somewhat different times, the identity of the participants (once involved) remained constant throughout, as did their collaboration on Frega cases, including the cooperation of all three judges in connection with the *Security Pacific* litigation. Contact among the judges and Frega was frequent, especially during times when Frega had trials or settlement conferences pending. None of the judges disclosed his financial (or personal) relationship with Frega or that Frega cases were being assigned to "friendly" courts. Frega customarily wrote off his purchases of goods or services for the judges as case-related expenses. Finally, the pattern of mutual favors and nondisclosure continued until the California Commission on Judicial Performance began investigating ethics violations and even then, Malkus, Greer and Adams worked together to tell similar, but false, stories.

Malkus's contention that the evidence at best shows only a single conspiracy between Frega, Williams and him fails in light of evidence that he and Greer both got memberships to the Cuyamaca Health Club from Frega at the same time, they both concealed the source of their membership on their 1987 disclosure forms, and both gave identical false statements to the Judicial Commission in 1991 about where the membership came from and how much it was worth. Malkus's assertion that the government's proof of non-official acts materially varied from the indictment's "bribery/official act" theory fails as well, given his own admission to his clerk that he was "vulnerable" to Frega and his own activities in trying to tear up evidence in official records of Frega cases. Malkus testified that he did not know about Frega's gifts, but the jury could, and did, disbelieve him.

Adams's contention that the evidence at most supports a finding of a single conspiracy between Frega, Williams and him likewise fails. The evidence shows that Adams accepted Frega's gifts and the assignment of at least one case for a settlement conference that had previously been

assigned to Malkus and transferred to another judge for trial. In addition, he retained jurisdiction in the *Security Pacific* case, contrary to his usual practice, and consulted with Greer, Frega and Malkus about it. That he mostly presided over settlement conferences that are not binding on a party does not compel a different conclusion since it is the acceptance of a bribe that matters. In any event, favorable treatment, as Greer testified, can happen even in the context of a settlement conference by virtue of the way the judge responds to the positions taken by the parties and the opinions he expresses.

In sum, evidence of interaction among Frega and the judges revolving around the handling of Frega cases links all of them together with the same objective of benefiting Frega and themselves financially. Even though the evidence shows all three judges working together only in connection with *Williams*, that collaboration supports an inference of agreement. At least two were involved in every other proceeding. Each had a role in the overall scheme: Greer's was to use his position as presiding judge to assign Frega cases to "friendly" courts; Malkus's role was to make rulings as a trial judge; and Adams's was to use his talents as a settlement judge. Each was dependent on the others not to say anything publicly, because one confession would necessarily implicate the others. Further, strategy was coordinated through lunches, in-chambers meetings, and telephone calls. This suffices to show common purpose, not separate agreements and separate purposes. *See Taren–Palma*, 997 F.2d at 530.

Finally, the court gave a "single conspiracy" instruction that eliminated any possibility of divergence between the RICO conspiracy charge in the indictment and the RICO conspiracy charge upon which the defendants were ultimately convicted.[5] Therefore, even if there were a possibility of finding a conspiracy other than that charged, Adams, Malkus, and Frega could not have been prejudiced because the jury could not have convicted on the basis of such conspiracy under the instructions it was given. *See Ramos–Oseguera*, 120 F.3d at 1035.

Thus, there was sufficient evidence for a rational juror to find beyond a reasonable doubt that there was a single overall conspiracy in violation of RICO and that Frega, Adams and Malkus were members of it.

B

Frega suggests that Count One, charging a RICO conspiracy, was defective for (among other things) failing to allege predicate acts. He, Adams and Malkus argue that allowing the jury to consider all the evidence in determining whether they were guilty of a RICO conspiracy compounded that error. This issue arose during deliberations, when the jury sent a note to the court, asking:

> Are the racketeering acts in Court's Instruction 39 [listing the twenty-four predicate acts Frega was charged with committing] only applicable to Count 20 [the RICO substantive offense] or are they also used in Count One [the conspiracy offense]? Are the racketeering acts in Court's Instruction 39 the only racketeering acts to be used for Count One?

The court responded by stating: "Instruction 39 only applies to Count 20; but all of the evidence that you have heard or seen during the trial may be considered by you as to all counts."

---

5. The jury was instructed:
 You must decide whether the conspiracy charged in the indictment existed, and, if it did, who at least some of its members were. If you find that the conspiracy did not exist, then you must return a not guilty, even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though the defendant may have been a member of some other conspiracy.

As Frega and Adams see it, Count One listed only overt, rather than predicate, acts, yet to convict on Count One, the jury had to find an agreement to conduct the affairs of the court through two predicate acts. Whereas predicate acts must be criminal, overt acts need not be. Thus, Frega and Adams reason, even though Instruction 39 did apply only to Count Twenty, the jury was left with no identifiable racketeering acts as to Count One. As such, the jury was free to create its own predicate acts and to convict on a charge not presented to the grand jury. I disagree.

The indictment charged, and the court clearly instructed, that the pattern of racketeering through which Frega, Adams and Malkus agreed to conduct the affairs of the superior court consisted of multiple acts of bribery in violation of §§ 92 and 93 of the California Penal Code, and with respect to the judges only, obtaining property under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951 ("extortion"). The court instructed on what constitutes bribery and what constitutes extortion. While Frega disagrees with how bribery was defined for reasons we agree should be rejected in Part VI, the instructions were nevertheless precise in identifying the racketeering acts charged in Count One-bribery in violation of §§ 92 and 93 of the California Penal Code, and extortion in violation of the Hobbs Act-and in explaining the elements required for finding each.

Beyond that, there is no requirement that the specific dates, times, cases and details of each incident of bribery or extortion be spelled out in the conspiracy charge, as Frega and Adams and the majority seem to suggest. Indeed, "[t]here is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes.... The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense

..." *Salinas v. United States,* 522 U.S. 52, ——, 118 S.Ct. 469, 476, 139 L.Ed.2d 352 (1997). As the Court explained in *Salinas,* "[t]he RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts." *Id.* at ——, 118 S.Ct. at 477. Further, "[i]t makes no difference that the substantive offense under subsection (c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Id.* at ——, 118 S.Ct. at 478.

We had basically said the same thing in *United States v. Tille,* 729 F.2d 615 (9th Cir.1984), making clear that RICO conspiracy "does not require proof that a defendant participated personally, or agreed to participate personally, in two predicate offenses." *Id.* at 619. Put another way, all that is needed is proof of an agreement the objective of which is a substantive violation of RICO. *See id.*

Thus, to establish a RICO conspiracy there must be an objective which is a substantive violation of RICO, and proof of agreement by the defendants to accomplish that objective. Here, both were pleaded, instructed on, and proved. The objective was to conduct the affairs of the superior court through a pattern of racketeering activity consisting of multiple acts of bribery of California Superior Court judges in violation of § 92 of the California Penal Code. This objective was a substantive violation of RICO for which Frega was convicted. And Adams and Malkus "knew about and agreed to facilitate the scheme [of bribery perpetrated by Frega]." That's all that *Salinas* and *Tille* require.[6]

---

**6.** In fact, this is exactly what happened in

*Salinas.* Salinas was acquitted on a substan-

Accordingly, the jury was free to consider all the evidence, as the court instructed. Instruction 39 was not needed to direct (or constrain) the jury's deliberation on the RICO conspiracy charge. Rather, Instruction 39 was necessary only on the substantive RICO count-the only RICO charge that required proof of two or more predicate acts. The district judge got it right, and I would affirm.

## C

Malkus argues that other instructions, primarily with respect to the RICO conspiracy count, were confusing and thereby violated his Fifth and Sixth Amendment rights.[7] He first claims that Instruction 7, which required the jury to find "a plan to commit the crime alleged in the indictment as an object of the conspiracy," was misleading because it is a general conspiracy instruction, whereas RICO requires an agreement that the two predicate acts alleged in Count One be committed. However, the instructions went on specifically to instruct that the crime the government had to prove was that the defendants conspired "to participate in the affairs of an interstate enterprise, the superior court, through a pattern of racketeering activity," and that "a pattern of racketeering activity" consists of "at least two acts of racketeering"-bribery under California law and extortion under the Hobbs Act. Thus, there could be no confusion.

Next, Malkus faults Instruction 8, which stated: "Once you have decided that a defendant was a member of a conspiracy, the defendant is responsible for what other conspirators said or did to carry out the conspiracy, whether or not the defendant knew what they said or did." Malkus contends this instruction deprived him of his defense of lack of knowledge and criminal intent. However, this is not the case. The court explained that co-conspirator liability applies only after the jury has decided that a defendant is a member of the conspiracy, which in turn requires "willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy." In addition, the court instructed on the need for corrupt intent in connection with the predicate bribery offense.

Malkus complains that Instruction 9 was confusing because it required the government to demonstrate beyond a reasonable doubt that an overt act in furtherance of the conspiracy occurred within five years of the filing of the indictment in spite of the fact that overt acts aren't required under RICO. While it is true that a RICO conspiracy conviction does not require proof of an overt act, see *Salinas*, 522 U.S. at ——, 118 S.Ct. at 476; *United States v. Blinder*, 10 F.3d 1468, 1477 (9th Cir.1993), the error, if any, favors Malkus because he was found guilty of conspiracy even with the extraneous requirement. Certainly, he would have been found guilty without it.

Malkus asserts that Instruction 11 is internally inconsistent in that it told the jury that

> [e]ven though a defendant did not directly conspire with the other defendants or other conspirators in the overall scheme, he has, in effect, agreed to participate in the conspiracy if it is proven beyond a reasonable doubt that ... he directly conspired with one or more

tive RICO count and convicted on a RICO conspiracy count. *See Salinas*, 522 U.S. at ——, 118 S.Ct. at 473. The conspiracy conviction was affirmed because the evidence showed that a coconspirator, Marmolejo, committed at least two acts of racketeering activity when he accepted numerous bribes, and that Salinas knew about and agreed to facilitate the scheme. *See id.* at ——, 118 S.Ct. at 478.

7. Because he failed to object to Instructions 7, 8, 9, 11 and 13 at trial, our review is only for plain error. *See United States v. Montgomery*, 150 F.3d 983, 996 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 267, 142 L.Ed.2d 220 (1998).

conspirators to carry out at least one of the objects of the conspiracy.

However, together with the rest of the instruction (which explained that the defendant must also know that other conspirators were involved with those with whom he directly conspired, and have had reason to believe that whatever benefits he might get were probably dependent on the success of the entire venture), Instruction 11 was a correct statement of the law. *See United States v. Bibbero,* 749 F.2d 581, 587–88 (9th Cir.1984).

Malkus contends that Instruction 13, which said that to establish a "pattern of racketeering activity," the government had to prove that at least two acts of racketeering were committed within ten years of each other, was inaccurate as it applied to Count One. While the jury did not have to find that any act of racketeering was ever committed to find a RICO conspiracy, *see Salinas,* 522 U.S. at ——, 118 S.Ct. at 476; *Blinder,* 10 F.3d at 1477, Malkus cannot have been harmed if the jury thought otherwise.

Malkus maintains that Instructions 24 and 25 are incomplete as they describe the interstate commerce requirement under the Hobbs Act in vague terms. However, instructing that the government had to show interstate commerce was "affected in some way," and that an "effect on interstate commerce" meant "that the alleged racketeering acts of extortion actually affected interstate commerce, or that such acts had a probable or potential impact upon interstate commerce," was sufficient.

Finally, Malkus contends that Instructions 49 and 50 are contradictory in that one allowed the jury to consider "sworn testimony, exhibits and stipulated facts," whereas the other told the jury it could consider "only the testimony and exhibits received into evidence." As stipulated facts are in fact received into evidence, I cannot see how the jury could have been confused. In any event, the court also described matters that "are not evidence" and that "may not be considered in decid-

ing what the facts are." Stipulated facts were not among them.

For these reasons, I would affirm across the board.