Filed 9/18/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THOMAS MOYER,<br><br>    Defendant and Respondent. | H049408<br>(Santa Clara County<br>Super. Ct. No. C2015936)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on August 25, 2023, be modified as follows:

1.    On page 1, line 9, the word "reasonable" is deleted and replaced with the word "strong" so the sentence reads:

We also conclude that the evidence presented to the grand jury was sufficient to raise a strong suspicion of such bribery.

2.    On page 21, line 9, the word "reasonable" is deleted and replaced with the word "strong" so the sentence reads:

Thus, the grand jury had more than enough evidence to create a strong suspicion that Undersheriff Sung was abusing his authority over CCW licenses to extract favors from, among others, Moyer.

3.     On page 21, line 13, the word "reasonable" is deleted and replaced with the word "strong" so the sentence reads:

The grand jury also had enough evidence to create a strong suspicion that Moyer promised a sizable donation of iPads to the Sheriff's Office to persuade Undersheriff Sung to release Apple's CCW licenses.

4.     On page 23, line 5, the word "reasonable" is deleted and replaced with the word "strong" so the sentence reads:

In light of the delay in releasing Apple's CCW licenses until the iPad donation promise had taken shape, the discussion of both the licenses and the donation at the February 8 meeting, Captain Jensen's subsequent involvement with both the licenses and the donation, and other evidence of unusual activity, the grand jury had adequate grounds for entertaining a strong suspicion that Undersheriff Sung demanded, and Moyer gave, a promise to make the iPad donation in exchange for release of Apple's CCW licenses.

5.     On page 26, line 1, the word "reasonable" is deleted and replaced with the word "strong" so the sentence reads:

The evidence presented to the grand jury, however, created a strong suspicion (and therefore permitted the grand jury to find) that Moyer proposed the iPad donation principally for another purpose: to secure release of Apple's CCW licenses.


There is no change in judgment.

                                 _____

                                 BROMBERG, J.

WE CONCUR:

_____
GROVER, ACTING P.J.

_____
LIE, J.

*People v. Moyer*
H049408

Filed 8/25/23 (unmodified opinion)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THOMAS MOYER,<br><br>    Defendant and Respondent. | H049408<br>(Santa Clara County<br> Super. Ct. No. C2015936) |

This appeal raises a question not yet addressed by any California court: whether a public official may be bribed with a promise to donate to the official's office. According to the People, the Santa Clara County undersheriff requested—and defendant Thomas Moyer made—a promise to donate iPads to the Santa Clara County Sheriff's Office in exchange for releasing concealed carry weapon (CCW) licenses that the sheriff had signed. Consistent with the Ninth Circuit's interpretation of California law, federal law and the law in many states, we conclude that such a promise may constitute a bribe. We also conclude that the evidence presented to the grand jury was sufficient to raise a reasonable suspicion of such bribery. Accordingly, we reverse the trial court's order dismissing the bribery count against Moyer, reinstate that count, and remand for further proceedings.

# I. Background

Because defendant challenges the sufficiency of the evidence presented to the grand jury, we recount that evidence below. As required on appeal, we consider that evidence in the light most favorable to the indictment, drawing all legitimate inferences in favor of it. (See, e.g., *Stark v. Superior Court* (2011) 52 Cal.4th 368, 406-407 (*Stark*); *People v. Guzman* (2011) 201 Cal.App.4th 1090, 1096.)

## A. *CCW Licenses in Santa Clara County*

The Penal Code authorizes, but does not require, county sheriffs to issue licenses to carry concealed weapons to applicants who are of good moral character, have good cause for a license, reside or work in the county, and have completed a specified course of training. (Pen. Code, § 26150, subd. (a)[1]; but see *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S.__, __ [142 S.Ct. 2111, 2123-2124, 2156] [noting that California's good cause requirement is similar to the New York "proper-cause" requirement held unconstitutional under the Second Amendment].) In the Santa Clara County Sheriff's Office, CCW applications are processed by the public information officer, who is responsible for conducting background checks, arranging fingerprinting, and ensuring that applicants complete the required trainings.

During the relevant time frame, the Santa Clara County Sheriff's Office rarely issued CCW licenses. Indeed, the office's practice was to not even process an application for a CCW license absent a special instruction to do so. Only Sheriff Laurie Smith and a small number of others in the Sheriff's Office had the authority to give such instructions. One of those individuals was Rick Sung, who appears to have run Sheriff Smith's 2018 re-election campaign and after the election became the undersheriff, second in command to the sheriff. Undersheriff Sung also had authority to place license applications on hold even after licenses were signed by the sheriff.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Undersheriff Sung abused his authority over CCW applications to extract favors. In 2016 or 2017, Harpreet Chadha, a business owner, applied to renew a CCW license. After the license was signed, Sung placed the license on hold and met with Chadha. Afterwards, Chadha attempted to schedule an event for the sheriff in his company's luxury suite in the San Jose sports arena. The event did not take place then, and Chadha's CCW license remained on hold for more than a year until Sung spoke with Chadha in December 2018 and a new permit was prepared. On February 14, 2019, Chadha hosted an event for Sheriff Smith in his company's luxury suite. That same day, Chadha received his CCW license.

B. *Apple's CCW Applications*

Thomas Moyer is Apple, Inc.'s head of global security. The company's executive protection team is under his supervision. In 2016 and early 2017 the team began receiving more serious threats against Tim Cook, Apple's CEO, and became concerned about its ability to respond to these threats. As a consequence, in early 2017, Apple decided its executive protection team should be armed and began taking steps to obtain CCW licenses for team members, many of them based in Santa Clara County.

1. The 2017 Meeting with Undersheriff Sung

In August 2017, after several initial approaches were rebuffed, two Apple officials—David Gullo, senior director of global security, and Eric Mueller, senior director of operations for the security team—met with Undersheriff Sung to discuss CCW licenses. In the meeting Sung said he would help Apple obtain licenses.

At the end of the meeting, Undersheriff Sung brought up the upcoming election for sheriff and asked Gullo and Mueller if they would support Sheriff Smith's re-election. The request raised "a red flag" for Gullo because Sung appeared to be linking CCW licenses to his request for political support. Consequently, Gullo reported to Moyer that "we were approached by the Sheriff's Office, and they wanted us to support the Sheriff for re-election." Moyer responded with a "[c]ouple of rules": "You are free to support

3

whomever you like," but "[y]ou should not feel like you need to support her because you work for Apple." Moyer also added pointedly, "We will not give money or anything of value in exchange for CCW[s]."

2. The 2018 CCW Applications

For nearly a year, Apple's CCW applications made little progress. In June 2018, Moyer got involved personally and secured a meeting with Sheriff Smith. After the meeting, Moyer told the leader of the executive protection team that the sheriff would approve the CCW licenses, and he should "start preparing the Santa Clara CCW paperwork for the team."

The next month, members of the executive protection team submitted CCW applications to the Santa Clara County Sheriff's Office. The public information officer, however, did nothing because he received no instruction to process the applications even when he specifically asked Sheriff Smith about them.

3. Moyer's Donation to Sheriff Smith's Campaign

Although Moyer had said in August 2017 that Apple would not give anything of value in exchange for CCW licenses, in October 2018 Mueller donated $1,000, the maximum allowable amount, to Sheriff Smith's re-election campaign based on Undersheriff Sung's "ask" a year earlier. After Mueller informed Moyer of the donation, Moyer likewise donated the maximum amount to Sheriff Smith's campaign, and Mueller informed the sheriff's campaign of both donations.

4. Processing of the CCW Applications and Signing of the Licenses

Several days after donating to Sheriff Smith's campaign, Moyer emailed the sheriff to check on the status of Apple's CCW applications. Moyer followed up the next week, and at the end of the month Apple put together a report on the increasing number of threats against its CEO in hopes of speeding up issuance of the CCW licenses.

After the November 2018 election, the public information officer asked Undersheriff Sung about Apple's CCW applications. Sung responded that one of

4

Apple's security officers had actively supported Sheriff Smith's opponent in the election and that he would not allow the licenses to be granted if that officer was the one requesting them.

Later in November, Undersheriff Sung called Mueller. Sung expressed anger that some Apple security officials had endorsed Sheriff Smith's opponent. After this "venting," Sung turned to the CCW applications and asked to meet about them in person. Later that day Mueller again talked with Sung, who told him that the licenses had been "signed off on" and asked to meet with Moyer. The following day, Mueller sent an email to Sung's personal email address "[r]eintroducing" him to Moyer.

That same day, Undersheriff Sung directed the public information officer to process Apple's CCW applications. In January 2019, after the applicants were fingerprinted and had completed their firearm range qualification tests, Sheriff Smith signed the CCW licenses, which were sent to an administrative assistant. However, before the assistant could tell the applicants to pick them up, the licenses were removed from her desk.

5. The February 8, 2019 Meeting

On January 23, 2019, Undersheriff Sung sent an email from his personal email account to Moyer, asking to set up a meeting with Moyer, Sheriff's Office Captain James Jensen, and himself. This meeting took place on February 8 in the visitor's center at Apple Park.

Although Apple had no established program for donating products to law enforcement agencies, and the Sheriff's Office had no immediate need for iPads, during the meeting Moyer sent himself a blank email with the subject line: "IPad Donation."

Immediately after the meeting, Moyer emailed the leader of Apple's executive protection team that "[y]ou will have your permits shortly."

5

6. The Promised iPad Donation and Release of the CCW Licenses

On February 10, 2019, two days after meeting with Undersheriff Sung and Captain Jensen, Moyer emailed a senior finance manager at Apple asking about the rules for donating iPads or computers to the local sheriff's office for its "new training facility." The following day an Apple compliance attorney replied that California public agencies may accept donations but asked Moyer to "make sure that there are no significant matters or purchases pending with the agency." In response Moyer made no mention of Apple's pending CCW license applications. Instead, he told the compliance attorney that "we are not doing this because we are receiving anything in exchange." Moyer informed the attorney of the applications only after the licenses were issued and does not appear to have disclosed that the applications were pending when the iPad donations were first proposed.

About a month later, Moyer emailed Captain Jensen. Although in fact the Sheriff's Office was not setting up a new training center, Moyer said that "[y]ou mentioned previously that you folks were setting up a new training center." Then, Moyer said he was "[c]urious if you have a need for iPads or potentially computers for that facility."

Captain Jensen forwarded Moyer's email to Undersheriff Sung and Assistant Sheriff Michael Doty. Later that day, Sung asked Doty to "start thinking of ideas on how we could utilize either computers or iPads from Apple in the training division." When Doty suggested asking for 50 iPads, Sung told Doty to think bigger, and ultimately they asked for 200 iPads, which were worth $50,000 to $80,000.

On March 26, 2019, members of Apple's executive protection team were told to pick up their CCW licenses, which they did at the Sheriff's Office. Although by that point he had no regular involvement in processing CCW applications, Captain Jensen personally handed out the licenses.

6

7. <u>Termination of the Promised iPad Donation</u>

In the months following the release of Apple's CCW licenses, Moyer took several steps to complete the promised iPad donation to the Sheriff's Office, such as meeting with Assistant Sheriff Doty in late April to agree on the number of iPads and making an internal proposal for the donation. Moyer also asked Captain Jensen if the Sheriff's Office had any color preference and apologized for "the wheels moving very slowly." Notably, however, Moyer did not inform Gullo, the head of Apple's executive protection team, of the donation, and Jensen likewise did not inform the law enforcement personnel primarily responsible for Apple's headquarters.

In August 2019, Moyer terminated the promised donation. On August 7, he informed Apple's chief litigation attorney that the treatment of CCW applications by the Santa Clara County Sheriff's Office was being investigated. Although Moyer had failed to mention Apple's CCW applications to the compliance attorney in February, he then disclosed the approved applications as well as his $1,000 donation to the sheriff's re-election campaign that had been made while the applications were still pending. Moyer also said that Apple had approved a donation of $50,000 worth of iPads to the Sheriff's Office, adding later that day that "we should table Apple's iPad donation." The attorney agreed, and less than three minutes later Moyer instructed the personnel handling the promised donation to stop it.

C. *Procedural Background*

In November 2020, prosecutors presented evidence concerning Apple's CCW applications and the promised iPad donation to a grand jury, which indicted Undersheriff Sung and Captain Jensen for soliciting bribes and Moyer for making one.

1. <u>The Instructions</u>

After the People finished presenting evidence to the grand jury, the prosecutor instructed the jury on the law, including the elements of bribery. In particular, the prosecutor instructed the jury that a "bribe" is the payment of "something of present or

7

future value or advantage, or a promise to give such a thing," made "with the corrupt intent to unlawfully influence" official action by the person bribed.

In subsequently urging the grand jury to indict Undersheriff Sung, Captain Jensen, and Moyer, the prosecutor elaborated on what may constitute a bribe. Many people, the prosecutor observed, think of a bribe as "money . . . sort of slid across the bench in a brown paper bag to a person." In fact, the prosecutor continued, "the thing of value does not have to go to the person that is being influenced" because a bribe "can either be something of value or a promise to give something of value. So it could be that the promise is given to the person that you are trying to influence and the thing of value could go to someone else."

The prosecutor offered an example: "if the police officer stops you on the side of the road and they're going to ticket you, and you say hey, if you don't ticket me I will give your niece $5,000, of course that's a bribe. Obviously, the officer is not getting the money, but the promise is going to the officer."

### 2. The Indictment

On November 19, 2020, the grand jury issued an indictment. The first count charged Undersheriff Sung and Captain Jensen with asking, receiving and agreeing to receive a bribe in violation of section 68, subdivision (a). The second count charged Moyer with bribing an executive officer in violation of section 67 by making "a promise of iPads to the Sheriff's Office" with the intent to influence an official action.

### 3. Dismissal of the Charge against Moyer

Moyer moved under section 995 to dismiss count 2 of the indictment. He argued that the prosecutor erroneously instructed the grand jury that it could charge him with bribery based on a promise to give a thing of value to a third party rather than to the target of the bribe. On June 1, 2021, the trial court granted the motion and dismissed count 2 of the indictment.

The trial court found no error in the instructions given to the grand jury. Noting that no case holds that a payment must go to the target of the bribe and that a target may benefit indirectly from things of value going to third parties, the trial court saw no reason why an official could not be bribed by promising to give a thing of value to a third party designated by the official.

However, the trial court concluded *sua sponte* that the evidence presented to the grand jury was insufficient to establish that Moyer had a corrupt intent in promising the iPad donation. In reaching this conclusion, the court noted that, by the time of the February 8, 2019, meeting in which Moyer allegedly promised the iPad donation, Moyer already had been repeatedly informed that Apple's CCW licenses would be issued. The court also observed that Moyer submitted the request to make the iPad donation through proper channels at Apple. It dismissed as unreasonable the inference that Moyer offered the donation to persuade Sung and Jensen to release Apple's CCW licenses.

The People timely filed a notice of appeal.

## II. Discussion

The People argue that the trial court erred in ruling the evidence of corrupt intent presented to the grand jury insufficient to support the indictment. Moyer defends this ruling and argues as well that a promise to make a payment to a third party or entity cannot constitute a bribe, even where, as here, the target of the bribe directed payment to that party or entity. We disagree and conclude that under the Penal Code's definition of "bribe" a promise to make a payment to a third party or entity may constitute a bribe. We also conclude that the evidence of corrupt intent presented to the grand jury was sufficient to support Moyer's indictment.

### A. *The Bribery Instruction*

Moyer challenges the gloss that the prosecutor placed on the definition of bribe. As the trial court recognized, the prosecutor largely followed the Judicial Council's pattern instructions in defining bribery and describing the elements of the charged

9

offense.  (See CALCRIM Nos. 2600 & 2603.)  Later, however, the prosecutor informed the grand jury that a promise to give a thing of value to a third party may constitute a bribe, as when a motorist promises to give money to a police officer's niece if the officer does not write a ticket.  Moyer argues that this gloss is erroneous, and his indictment must be dismissed because the grand jury may have been misled into indicting him on an impermissible theory.  (See, e.g., *Stark*, *supra*, 52 Cal.4th at p. 407; *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1022, fn. 1).

This argument raises a question of statutory interpretation, which we review de novo.  (See, e.g., *People v. Posey* (2004) 32 Cal.4th 193, 218.)  In interpreting statutes, our primary objective is to " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 849 (*Carmack*), quoting *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)  "We look first to ' "the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context." ' " (*People v. Jimenez* (2020) 9 Cal.5th 53, 61.)  We also " 'keep[] in mind the statutory purpose' " and seek to harmonize statutory provisions concerning the same subject " 'to the extent possible.' " (*Carmack*, *supra*, 2 Cal.5th at p. 850.)  If the meaning of the statute nonetheless remains uncertain, we turn to other indicia of the Legislature's intent such as " 'the consequences that will flow from a particular interpretation.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 354, 358.)

As the trial court correctly recognized, the Penal Code defines the term "bribe" more broadly than Moyer contends.  That definition does not limit bribes to promises to convey a thing of value to the target of the bribe, and we see no reason to imply such a limitation into the definition.  Instead, consistent with the Ninth Circuit's interpretation of California law, federal law and the law of many states, we interpret the Penal Code's definition of "bribe" as it is written to include promises to give a thing of value to a third party or entity.

1. The Penal Code's Definition of "Bribe"

Moyer argues that the target of a bribe must either receive payment or be promised personal receipt of payment, and therefore a promise to make a payment to a third party cannot constitute a bribe. The Penal Code, however, defines the term "bribe," and while that definition is not a model of clarity, nothing in it limits bribes to promises to make payments to the target of the bribe as opposed to a third party selected by the target. Moreover, implying such a restriction into the definition would exclude corrupt conduct such as Undersheriff Sung's alleged actions in this case from the scope of California's bribery statutes.

The Penal Code defines "bribe" as follows: "[t]he word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." (§ 7, subd. (6).) This language divides bribes into two general categories or prongs. The first prong concerns direct payments: "anything of value or advantage" that is requested, given, or accepted with the intent to corruptly influence its target. The second prong concerns promises: "any promise or undertaking to give any[thing of value or advantage]" that is requested, given or accepted to corruptly influence its target.

While the payment prong requires that the target of the bribe receive a "[]thing of value or advantage"—typically, a payment—the promise prong requires only that the target receive a promise to make a payment, not a promise that the target, rather than some other party, will receive a payment. As Moyer points out, the Penal Code's definition of bribe requires a corrupt intent to influence "the person to whom *it* is given." (§ 7, subd. (6), italics added.) In the payment prong, "it" refers to the payment made (*ibid*.), and therefore the payment must be made to the target of the bribe. In the promise prong, however, "it" refers to a "promise or undertaking to give any[thing of value or advantage]." (*Ibid*.) Thus, under the promise prong, the target must receive a promise

11

that a payment will be made. There is, however, no additional requirement that the payment be promised to the target of the bribe. To the contrary, under the plain language of the definition, the promise may be to make a future payment to anyone, whether a third party or the target.

This conclusion is supported by the specific language of the promise prong. The Penal Code defines "bribe" to include "*any* promise or undertaking" to give a thing of value. (§ 7, subd. (6), italics added.) As the Supreme Court has recognized, "[u]se of the term 'any' " in a law "demonstrates the Legislature intended the law to have a broad sweep." (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 714.) Indeed, "any" is defined to mean, among other things, "one or some indiscriminately of whatever kind" (Webster's 3d New Internat. Dict. (1993) p. 97), and therefore a reference to "any" item or object in a statute is "most naturally read to mean [items or objects] of whatever kind." (*Ali v. Federal Bureau of Prisons* (2008) 552 U.S. 214, 218-219.) As a consequence, the Penal Code's reference to "any promise or undertaking to give any[thing of value or advantage]" is naturally read to mean promises to make payments of any kind, not just promises that the target of the bribe will receive payment in the future.

This interpretation makes sense. The Penal Code's definition of bribe applies not only when a bribe is "given" to a public official, but also when a public official has "asked" for a bribe. (§ 7, subd. (6); see § 68, subd. (a).) If a personal receipt requirement were implied into the promise prong, and that prong were limited to promises of future payment to the target of the bribe, executive officials would be free to demand payments to their relatives or friends in exchange for official actions without fear of prosecution for bribery (at least as long as such payments are not an indirect conduit to the officials). Indeed, were Moyer's interpretation adopted, Undersheriff Sung's indictment for bribery might have to be dismissed because he demanded that iPads be donated to the Sheriff's Office rather than to himself. We see no reason why the Legislature would have defined bribe to allow such alleged corrupt conduct, and certainly no reason to force into the

12

definition of bribe an implied restriction allowing it.  (See, e.g., *People v. Bullard* (2020) 9 Cal.5th 94, 106 [statutes should not be interpreted to create " 'obvious injustice' "].)

Moyer contends that a personal receipt requirement must be implied into the promise prong to avoid an untenable difference with the payment prong.  According to Moyer, "[b]ecause the statute does not apply when a would-be briber *delivers* a thing of value to a third party, it cannot possibly apply when the briber *promises* to give a thing of value to a third party in the future."  In fact, there is good reason to punish promises to pay third parties but not unsolicited payments to such parties.  When a public official extracts a promise to give something of value to a third party selected by the official, there is a clear danger that the official's action will be improperly influenced.  The danger of improper influence is much lower where, without any solicitation or promise, a party gives money to a third party.  In that situation, the deed has been done, and the official presumably has little, if any, incentive to take improper action as a result of the payment. It is true that an unsolicited gift to a relative, once known by an official, might generate a sense of gratitude that in turn might influence the official.  The Legislature, however, reasonably may have deemed this threat minimal.  Indeed, the federal government has done just that: while the federal bribery statute covers both payments and promises to make payments to public officials, it covers only promises to make payments to "any other person or entity."  (28 U.S.C. § 201(b)(1).)

Moyer tries to find support for his personal receipt requirement in an 1895 Supreme Court decision, *People v. Ward* (1895) 110 Cal. 369 (*Ward*).  While this decision was issued after the current definition of "bribe" was adopted (Amends. to the Codes 1873-1874, ch. 614, § 1), nothing in the decision suggests that the Supreme Court even considered that definition.  In *Ward*, the Supreme Court observed that there was no "promise to do something, or an undertaking of some kind which was, or would be, beneficial to the supervisor" targeted by the bribe in that case.  (*Ward*, *supra*, at p. 373.) The issue before the Supreme Court in *Ward*, however, was whether the indictment

complied with the then-applicable pleading requirement that an indictment describe the acts constituting the offense. (*Id.* at p. 371.) In the passage quoted, the Supreme Court simply concluded that the indictment did not comply with this requirement. (*Id.* at p. 373.) There is no indication that the Supreme Court considered the definition of bribe in reaching this conclusion, and therefore the decision has no bearing here. (See, e.g., *Santa Clara Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 243 ["It is axiomatic that an opinion is not authority for an issue not considered therein."].) The Court of Appeal's decision in *People v. Gaio* (2000) 81 Cal.App.4th 919 is similarly inapposite because it involved payments made to the target of the bribe and does not even mention promises of future payment. (*Id.* at p. 928.)

Thus, nothing in the Penal Code's definition of bribe supports the personal receipt requirement that Moyer seeks to imply into the promise prong of the definition.

### 2. The Political Reform Act

Moyer also argues that a personal receipt requirement should be implied into the promise prong of the bribe definition to avoid a conflict with the behested payment provision of the Political Reform Act of 1974, Government Code section 81000 et seq. That provision requires elected officials to report payments made at the official's request for, among others, charitable or governmental purposes. (Gov. Code, § 84224, subd. (a); see also *id.* § 82004.5 [defining behested payment].) Moyer asserts that, unless the promise prong is construed to include a personal receipt requirement, it will permit prosecution of behested payments and "chill the willingness of elected officials and donors to engage in these charitable/governmental practices."

Moyer fails to substantiate this assertion. The promise prong of the Penal Code's definition of "bribe" does not subject most promises to make a donation at the behest of a public official to prosecution. A promise to make a payment to a third party satisfies only one element of bribery. To constitute bribery, such a promise must be made "with a corrupt intent to influence, unlawfully, the person to whom it is given" in an official

14

activity. (§ 7, subd. (6).) Moyer fails to identify any situation in which a promise made in good faith to contribute to a charity, or a government entity could satisfy the corrupt intent requirement. As a consequence, Moyer fails to show any conflict between the promise prong, as written, and the behested payment provision of the Political Reform Act.

In any event, the Legislature has instructed how to harmonize the Political Reform Act with other statutes. The Act states that "[n]othing in this chapter shall exempt any person from the applicable provisions of any other laws of this state." (Gov. Code, § 91014.) Thus, if there were any conflict between the Political Reform Act's behested payment provision and the promise prong of the definition of bribe, the Political Reform Act would have to yield.

### 3. The Rule of Lenity

Moyer argues as well that, "to the extent there is any ambiguity," the rule of lenity requires that a personal receipt requirement be implied into the promise prong. In fact, the rule of lenity is inapplicable. When a statute defining a crime or punishment is susceptible of two interpretations of roughly equal plausibility, the rule of lenity requires adoption of the interpretation more favorable to the defendant. (*People v. Avery* (2002) 27 Cal.4th 49, 57 (*Avery*).) In other words, "the rule of lenity is a tie-breaking principle" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1102, fn. 30 (*Lexin*)), which applies if there is "an *egregious* ambiguity" and " 'two reasonable interpretations of the same provision stand in relative equipoise' " (*People v. Manzo* (2012) 53 Cal.4th 880, 889, quoting *Lexin*, *supra*, 47 Cal.4th at p. 1102, fn. 30; see also *Avery*, *supra*, 27 Cal.4th at p. 58). The rule has no application where a court can "fairly discern" legislative intent. (*People v. Soto* (2018) 4 Cal.5th 968, 980, quoting *People ex Rel Green v. Grewal* (2015) 61 Cal.4th 544, 565; *People v. Cornett* (2012) 53 Cal.4th 1261, 1277; *Avery*, *supra*, 27 Cal.4th at p. 58.) As shown above, that is the case here.

15

### 4. Constitutional Considerations

Finally, Moyer argues that a personal receipt requirement must be implied into the promise prong because otherwise California's bribery statutes would be expanded in an unforeseeable fashion in violation of due process. (See *People v. Heitzmann* (1994) 9 Cal.4th 189, 199 [statutes "must be definite enough to provide a standard of conduct for those whose activities are proscribed" and "must provide definite guidelines . . . to prevent arbitrary and discriminate enforcement"] (*Heitzmann*)); see also *Walker v. Superior Court* (1988) 47 Cal.3d 112, 141-142 (*Walker*).) In fact, it was foreseeable that California's bribery statutes would be construed to cover promises to make payments to third parties because Ninth Circuit precedent construing California law, federal law, and the law of many states, all allow bribery prosecutions for payments, or promises to give things of value, to third parties.

The Ninth Circuit interpreted California's bribery statutes to apply to payments to third parties more than thirty years ago. In *United States v Frega* (9th Cir. 1999) 179 F.3d 793 (*Frega*), an attorney and several Superior Court judges were charged with violating the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961 et seq. The indictment alleged multiple acts of bribery in violation of sections 92 and 93 (*Frega*, *supra*, at p. 799), including several payments to family members of the judges (*id*. at p. 807). The Ninth Circuit rejected the defendants' assertion that "payments to family members [are] beyond the reach of the bribery statute."[2] (*Ibid*.) As a consequence, for at least three decades, there has been precedent for applying California's bribery statutes to payments to third parties.

---

[2] In *Frega*, the Ninth Circuit also rejected the defendants' contention that the jury should have been instructed that a payment to a family member cannot be a bribe if the judge is not made aware of the payment. (*Frega*, *supra*, 179 F.3d at p. 807.) We express no opinion on the correctness of that ruling.

In addition, in other jurisdictions it is well established that promises to make payments to third parties may constitute a bribe. Federal law makes it a crime to make "promises" to a federal official "to give anything of value *to any other person or entity*[] with intent[] [¶] to influence any official act." (18 U.S.C. § 201, subd. (b)(1)(A), italics added.) Similarly, the Model Penal Code defines bribery to include any offer to confer a "pecuniary benefit" in consideration for official action (Model Pen. Code, §240.1, subd. (1)), and "benefit" is defined in turn to include "benefit to any other person or entity in whose welfare [the beneficiary of a bribe] is interested." (*Id.*, § 240.0, subd. (1).) Moreover, at least ten states have adopted in whole or in large part this definition of bribe. (See Del. Code Ann., tit. 11, § 1209(3); Haw. Rev. Stat. § 710-1000; Ida. Code § 18-1351(1); Neb. Rev. Stat. § 28-916.01(2); N.J. Stat. Ann. § 2C:27-1(a); 18 Pa. Stat. and Const. Stat. Ann. § 4501; Tenn. Code Ann. § 39-11-106(2); Tex. Pen. Code § 36.01(3); Va. St. Ann. § 18.2-446; W Va. Code Ann. § 61-5A-2(8).) Thus, federal law and the law of at least ten other states recognize that a promise to a public official to make a payment to, or confer a benefit upon, a third party may constitute a bribe. (See, e.g., *United States v. Menendez* (D.N.J. 2015) 132 F.Supp.3d 635, 639-640; *United States v. Siegelman* (11th Cir. 2011) 640 F.3d 1159, 1165-1166; *Commonwealth v. Moran* (Pa. 2014) 104 A.3d 1136, 1146.)

As a consequence, based on longstanding judicial construction of California's bribery statutes, federal law and the laws of many other states, Moyer had fair warning that a bribery charge might be based on a promise to make payments to a third party.

Moyer also argues that, without a requirement that promised payments be made to the target of a bribe, bribery statutes might be enforced in an arbitrary manner and become a convenient tool for discriminatory enforcement. As noted above, however, more than thirty years ago the Ninth Circuit interpreted California's bribery statute to cover payments to third parties, and federal law as well as the law of other states have long recognized that promises to make payments to third parties may constitute bribery.

Nevertheless, Moyer fails to cite a single instance in which those laws have been applied in an arbitrary or discriminatory fashion, and he does not identify a scenario in which this might happen.

We therefore find Moyer's constitutional objections unpersuasive and hold that the Penal Code's definition of "bribe" should be interpreted as it is written, without implying any personal receipt requirement into its promise prong.

### B. *Sufficiency of the Evidence Supporting the Indictment*

The People challenge the trial court's determination that the evidence of corrupt intent before the grand jury was insufficient to support an indictment. The People argue that the circumstantial evidence presented to the grand jury was sufficient to create a strong suspicion that Moyer bribed Undersheriff Sung and Captain Jensen when he promised to donate over $50,000 worth of iPads to the Santa Clara County Sheriff's Office in exchange for release of Apple's CCW licenses. We agree. While the evidence presented to the grand jury might be interpreted innocently and by itself may not be sufficient to support a conviction, it is sufficient to satisfy the much less stringent requirements for an indictment.

### 1. Standard of Review

Under section 995, an indictment must be dismissed if the grand jury indicted the defendant "without reasonable or probable cause." (§ 995, subd. (a)(1)(B).) "Reasonable or probable cause" means a state of facts leading a person of ordinary caution or prudence "[to] conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Mower* (2002) 28 Cal.4th 457, 473.)

The evidentiary showing needed to satisfy this standard is "exceedingly low." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846 (*Salazar*).) " 'Evidence that will justify a prosecution need not be sufficient to support a conviction' " (*People v. Scully* (2021) 11 Cal.5th 542, 582 (*Scully*), quoting *Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474), and "[a]n indictment may be justified even if the evidence leaves some

18

room for doubt" (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 698 (*Costa*)).  Reasonable or probable cause to indict exists " 'if there is some rational ground for assuming the possibility that an offense has been committed and the defendant is guilty of it.' "  (*Scully*, *supra*, 11 Cal.5th at p. 582; see also *People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 ["Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged."].)

With respect to an indictment, the grand jury sits as the finder of fact (*People v. Pic'l* (1982) 31 Cal.3d 731, 737 (*Pic'l*)), and we review *de novo* the sufficiency of the evidence supporting the grand jury's determination.  (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.)  In doing so, a reviewing court may not substitute its judgment on the weight of the evidence for the fact finder's (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1147-1148 (*Williams*)), and " '[e]very legitimate inference that may be drawn from the evidence must be drawn in favor of the [indictment]' " (*Pic'l*, *supra*, 31 Cal.3d at p. 737).  In addition, while there must be some showing concerning each element of the charged crime, "such a showing may be made by means of circumstantial evidence supportive of reasonable inferences."  (*Williams*, *supra*, 71 Cal.2d at p. 1148.)

2. The Evidence Presented to the Grand Jury

Drawing all legitimate inferences in favor of the indictment, we conclude that there was sufficient circumstantial evidence to create a strong suspicion that Moyer promised to donate iPads to the Sheriff's Office with a corrupt intent to influence Undersheriff Sung to release Apple's CCW licenses.  This evidence showed that Sung used CCW licenses to extract favors, that he released Apple's CCW licenses only after Moyer promised to make the donation of iPads in their February 8, 2019 meeting, and that Moyer's subsequent actions displayed a consciousness of guilt.

19

a. Undersheriff Sung's Misuse of Authority over CCW Licenses

The People presented evidence to the grand jury showing that Undersheriff Sung had broad authority over CCW licenses and that he used this authority to extract favors.

Under California law, sheriffs have authority to issue licenses to carry concealed weapons.  (§ 26150.)  Although the Penal Code sets forth requirements that applicants must satisfy, the Code does not grant an entitlement to a license: it merely states that a sheriff "may" issue a license when the statutory requirements are satisfied.  (*Ibid*.)  In fact, during the relevant time period, the Santa Clara County Sheriff's Office generally did *not* process applications for CCW licenses.  The Sheriff's Office, however, would process applications on instructions from several high-ranking officials, including Undersheriff Sung, and Sung had authority to hold licenses even after they were signed by the sheriff.  This authority gave Sung the power to extract favors from applicants, and he exercised that power.

For example, Undersheriff Sung forced one applicant to allow the sheriff to use a luxury suite.  Harpreet Chadha, the owner of a business with a suite at San Jose's sports arena, applied to renew his CCW license in 2016.  Although Sheriff Smith signed the license in October 2017, Sung put the license on hold so that he could meet with Chadha, and when he did, he attempted to schedule an event for the sheriff in Chadha's suite.  The event, however, did not take place until February 14, 2019, and it was only on that date— roughly sixteen months after Sheriff Smith signed Chadha's license—that Chadha picked up his license.

Undersheriff Sung also used his authority over CCW licenses to pressure Moyer and Eric Mueller, the senior director of Apple's security team, into contributing to Sheriff Smith's re-election campaign.  In August 2017, Mueller and another Apple official met with Sung to discuss the CCW licenses that Apple was trying to obtain for its executive protection team.  During the meeting, Sung brought up the sheriff's upcoming re-election and asked whether Mueller and another Apple official would support the sheriff.  The

suggestion raised a "red flag" because it appeared to connect the CCW licenses to political support for the sheriff, and when Moyer was told of it he responded that "[w]e will not give money or anything of value in exchange for CCW[s]."

Over the next year, however, Apple's CCW applications languished, and in October Moyer and Mueller donated money to Sheriff Smith's campaign—as Undersheriff Sung had requested the year before. Moreover, it was only after the election that the final steps for processing the applications took place and the sheriff signed the licenses.

Thus, the grand jury had more than enough evidence to create a reasonable suspicion that Undersheriff Sung was abusing his authority over CCW licenses to extract favors from, among others, Moyer.

b. The iPad Donation Promise

The grand jury also had enough evidence to create a reasonable suspicion that Moyer promised a sizable donation of iPads to the Sheriff's Office to persuade Undersheriff Sung to release Apple's CCW licenses.

Apple's CCW licenses were not released immediately after they were signed and ready for use. Sheriff Smith signed Apple's CCW licenses sometime in mid-January 2020, and normally the licenses would have been released immediately afterwards. They were not. Instead, shortly after Apple's CCW licenses were signed, they were removed from the desk of the administrative assistant who normally would have notified the applicants to pick them up.

Indeed, release of Apple's CCW licenses was delayed for two months, until after Undersheriff Sung had met with Moyer, the possibility of an iPad donation had been raised, and Moyer had returned with a concrete proposal. In late January 2019, around the time that release of Apple's licenses was held up, Sung—who, as mentioned above, had authority to hold up licenses signed by the sheriff—requested that Moyer meet with him and Captain Jensen. During this meeting, which occurred on February 8, 2019,

21

Moyer sent a blank email to himself with the subject line "IPad Donation." Two days later, Moyer began inquiring how to arrange such a donation, and in early March, Moyer emailed Jensen to propose donating iPads for a new training center. Three weeks later— and nearly two months after they were signed—Apple's CCW licenses were released.

This sequence of events creates a suspicion that Apple's CCW licenses were released in exchange for the promised iPad donation. This suspicion is heightened by evidence that both the licenses and the donation were discussed at the February 8 meeting between Moyer, Undersheriff Sung, and Captain Jensen. As noted above, during his February 8 meeting with Sung and Jensen, Moyer sent himself a blank email with the subject line "IPad Donation," which suggests that the donation was discussed during the meeting. In addition, shortly after the meeting, Moyer emailed the leader of Apple's executive protection team that "[y]ou will have your permits shortly," which suggests that the CCW licenses also were discussed. Furthermore, Jensen played an active role in both handling the iPad donation and handing out the CCW licenses, even though the donation was not for a program under his direct supervision, and he had no direct responsibility for CCW licenses.

Other evidence raises further suspicion. First, the promised iPad donation was both unusual and large. Apple had never before donated any products to law enforcement agencies. In addition, at Undersheriff Sung's suggestion, the Sheriff's Office requested 200 iPads—worth $50,000 to $80,000—even though previously the office had no need for iPads. Second, Moyer did not appear to have been much concerned about how the iPads would be used. He offered them for a new training center, even though the Sheriff's Office was not setting up such a center. Third, the donation was made secretively. Neither Mueller nor Gullo, the head of Apple's executive protection team, were informed of the planned donation, and the officers primarily responsible for law enforcement in and around Apple Park were likewise kept in the dark.

22

In light of the delay in releasing Apple's CCW licenses until the iPad donation promise had taken shape, the discussion of both the licenses and the donation at the February 8 meeting, Captain Jensen's subsequent involvement with both the licenses and the donation, and other evidence of unusual activity, the grand jury had adequate grounds for entertaining a reasonable suspicion that Undersheriff Sung demanded, and Moyer gave, a promise to make the iPad donation in exchange for release of Apple's CCW licenses.

c. Moyer's Intent

The grand jury also had evidence sufficient to create a strong suspicion that Moyer had a corrupt intent in promising the iPad donation. The trial court found insufficient evidence of corrupt intent because, by the time of his February 8, 2019 meeting with Undersheriff Sung and Captain Jensen, Moyer had been repeatedly informed that Apple's CCW licenses would be issued. As noted above, however, despite receiving assurances from the sheriff in June 2018, Apple's CCW applications had been languishing for months. In addition, Moyer had a "red flag" warning that Sung was using his authority over CCW licenses for improper purposes. As a consequence, the grand jury had ample ground for inferring that Moyer understood that he had to promise Sung something to obtain the release of Apple's CCW licenses.

This inference is supported by evidence showing Moyer's consciousness of guilt. Although, as the trial court pointed out, Moyer went through proper channels at Apple in requesting the iPad donation, Moyer was less than candid in doing so. For example, when a compliance attorney asked whether Apple had any significant matters pending with the Sheriff's Office, Moyer initially failed to disclose the CCW licenses that he had spent so much time trying to obtain, saying instead that "we are not doing this because we are receiving anything in exchange." He only revealed the licenses after they had been issued and does not appear to have disclosed that applications for them were still pending when he first proposed the iPad donation. Especially as Apple's CCW licenses

23

were discussed in the same meeting in which the grand jury reasonably could have inferred that the iPad donation was mentioned, the grand jury could have found this omission surprising and suspicious. As a consequence, the grand jury reasonably could have inferred that Moyer was trying to hide the connection between the donation and the licenses.

The grand jury also had grounds for suspecting that Moyer tried to create a false paper trail. As noted above, during his February 8 meeting with Undersheriff Sung and Captain Jensen, Moyer sent himself an email about the iPad donation, which suggests that the donation was discussed during the meeting. A month later, however, Moyer sent an email to Jensen saying he was "[c]urious if you have a need for iPads or potentially computers for that new facility[.]" Moyer also stated that Jensen had mentioned that the sheriff was "setting up a new training center," even though there was no new center. The grand jury could have inferred that these statements were intended to conceal that Moyer had discussed the promised donation the month before in the same meeting where Apple's CCW licenses were discussed.

Finally, the grand jury could have found further evidence of consciousness of guilt in the speed with which Moyer reacted upon learning that the Santa Clara County Sheriff's Office was under investigation for its treatment of CCW licenses. On August 7, 2019, the press reported that the Sheriff's Office had received a subpoena concerning CCW licenses. There was no mention in the article about Apple or the promised iPad donation, and in February, when asked by the compliance attorney about matters pending before the Sheriff's Office, Moyer had not disclosed Apple's CCW applications. In August, however, Moyer not only made a connection between the licenses and the promised donation; he also immediately emailed Apple's head litigator to disclose that the CCW applications had been pending when the iPad donation was promised and to recommend tabling the donation. And within three minutes after the litigator agreed, Moyer instructed those working on the donation to cease work. The grand jury could

have inferred from the speed with which Moyer made the connection between the CCW licenses and the iPad donation, disclosed it, and tabled the promised donation that he was gravely worried.

Moyer argues that the inferences urged by the People are speculative and unsupported. He contends that there are innocent explanations for many of the actions that the People contend are suspicious, such as Moyer's email to himself during the February 8 meeting and his reaction to news of the investigation of the Sheriff's Office. He also downplays his failure to disclose Apple's CCW licenses to the compliance attorneys, objects that he had no knowledge that Undersheriff Sung was holding up the licenses, and contends that the People are "piling inference upon inference."

These are substantial points, which, absent additional evidence, may be challenging to overcome at trial. At the indictment stage, however, proof beyond a reasonable doubt is not required. To the contrary, at that stage the standard is "exceedingly low." (*Salazar*, *supra*, 83 Cal.App.4th at p. 846.) To overcome a challenge to the sufficiency of the evidence presented to the grand jury, the People need show "reasonable or probable cause" (§ 995, subd. (a)(1)(B)), which requires only "some rational ground for assuming that an offense has been committed and the defendant is guilty of it." (*Scully*, *supra*, 11 Cal.5th at p. 582, quotation omitted.) We conclude that the evidence presented to the grand jury provided such a ground. (*Ibid.*)

3. Corrupt Use of Donations

Moyer argues that, even if his promise to donate iPads to the Sheriff's Office was intended to persuade Undersheriff Sung to release Apple's CCW licenses, he cannot have had a corrupt intent because the Political Reform Act allows behested payments. This argument is unpersuasive for three reasons.

*First*, Moyer has not shown that the proposed iPad donation would have been a behested payment. Donations "made principally" for "charitable" and "governmental purposes" may qualify as behested payments. (Gov. Code, § 82004.5, subd. (c)(4), (5).)

25

The evidence presented to the grand jury, however, created a reasonable suspicion (and therefore permitted the grand jury to find) that Moyer proposed the iPad donation principally for another purpose: to secure release of Apple's CCW licenses.

*Second*, while Moyer notes that behested payments are allowed by the Political Reform Act, he has not pointed to anything in the Act authorizing public officials such as Undersheriff Sung and Captain Jensen to demand (or receive) donations in exchange for performing their official duties. Indeed, it would be surprising if the Act authorized such demands. It has long been recognized that "[p]ublic policy and sound morals alike forbid that a public officer should demand or receive for services performed by him or her in the discharge of official duty other or further remuneration than that described by law." (52 Cal. Jur. (2023) Public Officers & Employees, § 357; see also *Noble v. City of Palo Alto* (1928) 89 Cal.App. 47, 51.)

*Third*, the People presented to the grand jury evidence that Moyer was less than candid about the iPad donation. As the trial court recognized, there is no corrupt intent when a corporation publicly offers to fund a public works project in exchange for a city council tabling a tax proposal, because in such a case the deal is made openly and lawfully. The situation here is different. Far from making a public deal, Moyer allegedly struck a private bargain with Undersheriff Sung and Captain Jensen to donate iPads in exchange for release of Apple's CCW licenses. In addition, far from disclosing this bargain, Moyer failed to mention the applications when compliance personnel asked about matters pending before the Sheriff's Office, and he took steps to actively conceal the connection between the applications and the promised donation until the investigation into the Sheriff's Office created too great a danger. While no corrupt intent may be inferred when a party openly makes a deal with a public entity, the grand jury reasonably could have inferred corrupt intent from such an undisclosed, "clandestine" bargain. (See *People v. Wong* (2010) 186 Cal.App.4th 1433, 1448 [corrupt intent can be inferred from "clandestine" payments and failure to fully disclose pertinent facts].)

26

### III.  Disposition

The order dismissing count 2 of the indictment is reversed, count 2 is reinstated, and this case is remanded for further proceedings.

_____
BROMBERG, J.

WE CONCUR:

_____
GROVER, ACTING P.J.

_____
LIE, J.

*People v. Moyer*
H049408

28

Trial Court:                                    Santa Clara County
                                                Superior Court No.:  C2015936


Trial Judge:                                    The Honorable Eric S. Geffon


Attorneys for Plaintiff and Appellant           Jeffrey F. Rosen, District Attorney
The People of the State of California:
                                                John Chase, Deputy District Attorney


Attorneys for Defendant and Respondent          Edward W. Swanson
Thomas Moyer:
                                                Mary McNamara

                                                Britt H. Evangelist


The People v. Moyer
H049408

29